BRANDON BARRINGER, Et Al, [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent. Barringer v. Commissioner
Docket Nos. 4567-69, 4568-69, 4569-69
United States Tax Court
T.C. Memo 1972-234; 1972 Tax Ct. Memo LEXIS 21; 31 T.C.M. (CCH) 1149; T.C.M. (RIA) 72234; November 27, 1972, Filed Ronald F. Kidd, for the petitioners. Mary Ann Hagan, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' income taxes for the years and in the amounts indicated: Docket
Calendar No.
Petitioner
Year
Deficiency
4567-69
Brandon Barringer
1965
$2,748.69
1966
3,527.96
4568-69
Brandon and Diana Barringer
1967
1,970.75
4569-69
Brandon Barringer, Surviving
1964
4,403.15
Husband, and Estate of
Sonia C. Barringer,
Deceased, Brandon Barringer,
Executor
The issues for decision are: (1) Whether petitioner Brandon Barringer made gifts of manuscripts to Princeton University for each of the taxable years 1964 through 1967 and, if so, what is the fair market value of the manuscripts donated in each year. (2) What is the fair market value of manuscripts donated to the University of North Carolina by petitioner Brandon Barringer in the taxable years 1964 and 1966? (3) Whether, as beneficiary of the Estate of Sonia C. Barringer, Brandon Barringer is entitled to deduct in 1966 a payment for *23 legal services to that estate as a deduction of the estate in excess of the estate income for its last year. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner Brandon Barringer, who is also surviving husband and executor of the Estate of Sonia C. Barringer, Deceased, resided in Villanova, Pennsylvania at the time of the filing of the petitions in these cases. Brandon Barringer and Diana Barringer, husband and wife, resided in Villanova, Pennsylvania at the time of the filing of their petition in this case. The respective petitioners filed their Federal income tax returns for the years here involved with the district director of internal revenue, Philadelphia, Pennsylvania. In 1959 Brandon Barringer (hereinafter referred to as petitioner) received an unsolicited letter from a Gene M. Gressley, the Archivist of the University of Wyoming Library, requesting that petitioner donate to the Western History and Archives Department of the University of Wyoming any historical records of petitioner's father, Daniel M. Barringer. Shortly after receiving this letter from Gressley, petitioner wrote Gressley informing him that "As he [Daniel *24 M. Barringer] graduated from Princeton, and all of his six sons went there, I am afraid they would have first call, once we get around to putting these in shape and distributing them." Several years thereafter, petitioner began what was to be an almost 10-year project of sorting and listing the papers of his father. These lists and the papers to which they referred were sent to Gressley in Wyoming for his appraisal beginning in 1962. Petitioner informed the librarian at Princeton that the material was being donated to Princeton and with his approval would be sent for appraisal to Gressley with the understanding that copies could be made by the University of Wyoming. Petitioner, at all times, considered Gressley to be an agent of Princeton University in the receipt of the documents for appraisal. Petitioner sent the letters and other papers of his father to Gressley with the understanding that upon completion of the copying and appraisal by Gressley, the papers were to be forwarded to the Princeton University library. On November 5, 1962, William S. Dix, the librarian of Princeton University wrote the following letter to Gressley: Dear Mr. Gressley: I quote a paragraph from *25 a recent letter of Mr. Brandon Barringer: "As to my father's papers, Mr. Gressley wrote me when he had only a few of them that he would appraise them for gift tax purposes at several thousand dollars. I have been sending my grandfather's papers to the University of North Carolina and they have had Duke appraise them. I realize that you often do your own appraisal, but in view of Mr. Gressley's possibly greater familiarity with western material, and the fact that he has received for your account a great deal more than he will have sent to you by December 31st, you might want him to provide you and me with whatever the right figure is." Mr. Barringer is incorrect in one point: Our counsel forbids us to make appraisals of papers or books given to us, since we are obviously a party at interest. Thus it had been my intention to call in an independent appraiser from outside. However, I certainly agree with Mr. Barringer that you are better qualified to make this appraisal than anyone in this region. Therefore I would certainly be very much pleased if you would be willing to send directly to him, with a copy to me, a statement of the estimated value. The formula which we usually use identifies *26 what is being appraised clearly in the opening paragraph: "The papers of… consisting of… presented by you to the Princeton University Library…" Petitioner's donation of the papers of his father to Princeton University by way of Wyoming continued from 1962 until 1969. In all, the donations comprised approximately 390 file folders and 106 letter books. The file folders contained miscellaneous documents such as letters received by Daniel M. Barringer, maps, deeds, and corporate minutes. The letter books contained reproductions of letters written by Daniel M. Barringer. Each letter book consisted of 1,000 pages. The pages in the books are rice paper. When a letter was pressed onto the dampened rice paper, a reproduction of the letter, including the signature was left on the rice paper. During the year 1964 petitioner sent Gressley the following items: Seven letter books relating to the corporate affairs of the Standard Iron Co. from December 18, 1906 to April 13, 1926; one letter book relating to Mexican Iron, December 7, 1902 to December 1, 1903; one letter book relating to Pioneer Exploration and Development Co.; two letter books relating to the Commonwealth Exploration Co. *27 ; one letter book with parts not completely legible, relating to the Eastern Exploration Co.; one letter book relating to the Federal Exploration Co., entitled the Federal Exploration Letter Book No. 2; one letter book relating to the Federal Iron Ore Syndicate and Santo Domingo operations; one letter book relating to West Coast Iron operations; two letter books relating to the Horsetown and Shasta Dredging Co.; one letter book relating to the El Palmarito mine; and an illegible letter book relating to the Hanover Bessemer Co. During this same year, petitioner sent Gressley a miscellany of memorabilia such as personal budgets from the years around 1910 and several correspondence folders containing incoming letters and other documents, including papers relating to a controversy between petitioner's father and the National Geographic Society. During the year 1965 petitioner sent Gressley the following items: One letter book covering the activities of the Standard Iron Co.; one letter book relating to the sale of the Mont Louis Seigniory, a 70-square mile tract of land in Canada; two letter books covering the activities of the Commonwealth Exploration Co.; and three other illegible letter *28 books relating to mining operations. Petitioner also sent five personal letter books of his father covering the period from June 1909 to July 1913, and one in very poor condition covering the year 1923. One of these personal letter books contains copies of a number of letters sent to Woodrow Wilson, a friend and Princeton classmate of petitioner's father. Two of the personal letter books were in very poor physical condition. During this same year petitioners sent Gressley a number of correspondence folders containing letters received by petitioner's father. [2]
During the year 1966 petitioner sent Gressley the following items: Six personal letter books of petitioner's father covering the period January 9, 1913 to December 8, 1916, including 11 letters to President Wilson; a letter from President Theodore Roosevelt; [3] and 25 correspondence folders containing letters received by petitioner's father, many of which related to mining operations. *29 During the year 1967 petitioner sent Gressley the following items: Nine personal letter books of petitioner's father covering the period from December 1916 through January 1923; 19 folders of correspondence received by petitioner's father, including items dealing with the Pacific Iron and Steel Co., the Hanover Bessemer Co., the East Texas Iron Co., the Palmarito Mining Co., and the Shasta Dredging Co.; and notes of the 1888 Harvard Economic Geology lectures. [4]
The general physical condition of the letter books varied from fair to very poor, the latter being completely waterlogged. Approximately 20 percent of the letter books sent by petitioner to Gressley during the years in issue were illegible because of their physical deterioration. Some unused pages were contained in some of the letter books. Upon receiving the documents in Wyoming, Gressley discovered that approximately one-third of the documents would not reproduce onto microfilm. Gressley then began having the letter books copied by typewriter. The cost of typewriter transcriptions of the Barringer letter books was about 50 cents per page. Gressley had Xerox copies made of the material contained in the file folders. Upon completion of the copying and appraisal of a quantity of letter books and other material sufficient to comprise a fair sized shipment, Gressley would send the letter books and other material to Princeton University. Although much of the material sent to Wyoming by petitioner had been sent to Princeton during the years prior to 1968, none of the letter books sent to Wyoming by petitioner during the years in issue was received by Princeton from Wyoming during the years in issue, and in fact they were not received until shortly before the date of the trial of this case. From time to time, Princeton University would send petitioner a standard form of acknowledgment "for additions to the Barringer papers." These acknowledgments described briefly the meterial sent by petitioner to Gressley and appraised by the latter and not the material sent by Gressley to Princeton University. Princeton did not catalogue the Barringer papers as it received them, the librarian deciding instead to wait until Princeton had received the entire collection. To date, Princeton University has not specifically listed by name any Barringer manuscript in any of the various insurance policies covering manuscripts owned by Princeton University. The Western History Research Center at the University of Wyoming of which Gressley is director was established in 1945 to be a repository of documents concerned with the historical West. Its collections include the papers of several prominent western Senators and also the papers of persons and corporations connected with various industries in the West, including the petroleum industry, ranching, and mining. The Western History Research Center at Wyoming University is especially interested in purchasing material relating to mining in the western States. However, very little such material is available in the market. Daniel M. Barringer, petitioner's father and the author of the letters in the letter books heretofore described, was born in 1860 and died in 1929. He was a graduate of Princeton University, class of 1879, and was a classmate and friend of Woodrow Wilson. He was also a graduate of the University of Pennsylvania Law School but did not practice law for more than a few years. With Theodore Roosevelt and Owen Wister he formed the Boone and Crockett Club, a big-game hunting club. In 1889 he entered the field of mining engineering although he had little formal education in the field. He coauthored with John Stokes Adams a two-volume work, the Laws of Mines and Mining in the United States. Today Daniel M. Barringer's name is primarily associated with a large crater near Winslow, Arizona, which is known as Meteor Crater or Barringer Crater. While most scientists at that time asserted that the depression was the crater of an extinct volcano, Barringer was convinced that the crater was caused by an impacting meteorite. Moreover, Barringer believed that the meteorite was a huge mass of metal underneath the crater. Much of the information in the letter books of Daniel M. Barringer concerns his efforts at locating and attempting to mine this mass of metal. The Standard Iron Co. was the company formed to conduct mining and exploration of this mass of metal. In his taxable years 1964 and 1966 petitioner donated certain manuscripts to the University of North Carolina relating to petitioner's grandfather, D. Moreau Barringer. Petitioner's grandfather had been a United States Representative from North Carolina in the 1840's. In about 1848 he was appointed United States Minister to Spain. He was a member of the Washington Peace Conference of 1861 which attempted to prevent the outbreak of the Civil War. In 1964 petitioner made a gift to the University of North Carolina of 800 letters and documents written by D. Moreau Barringer. The subject matter covered the period from his Congressional career to his service as United States Minister to Spain. In 1966 petitioner gave to the University of North Carolina an assortment of letters written by D. Moreau Barringer, the most important of which is a series of 9 or 10 letters in 1854 describing a trip from North Carolina to Nashville, Tennessee where he met Mrs. James K. Polk, continued on to Memphis, and went down into Mississippi. Petitioner's first wife, Sonia Converse Barringer, died in 1964. Petitioner was the sole beneficiary and executor of her estate. In 1966 petitioner received from a law firm a statement in the amount of $3,055.60 addressed to him as executor of the Estate of Sonia Converse Barringer, reciting that the amount to the extent of $3,000 was for professional services re the administration of the estate and the balance for disbursements. Petitioner paid the amount of the statement to the law firm in 1966. At the time petitioner received this statement for legal fees, the administration of the estate was being terminated. Petitioner on his Federal income tax return for the year 1966 claimed a miscellaneous deduction in the amount of $3,158.70 for legal and other services to the Estate of Sonia C. Barringer in the taxable year 1966. Respondent in his statutory notice of deficiency disallowed this deduction to the extent of $3,055.60 as representing an unallowable personal expense. Petitioner on his income tax returns claimed charitable deductions for the documents sent to Gressley in Wyoming for the benefit of Princeton University and for the documents sent to the University of North Carolina based on the following values in the years indicated: Claimed Year
Donee
Value
1964
Princeton University
$10,521.00
University of North Carolina
1,605.00
1965
Princeton University
8,500.00
1966
Princeton University
9,350.00
University of North Carolina
270.00
1967
Princeton University
13,200.00
Princeton University and the University of North Carolina are both qualified donees under section 170, I.R.C. 1954. Respondent in his notice of deficiency disallowed the entire amounts of the deductions claimed by petitioner for the value of the manuscripts contributed by petitioner to Princeton University and the University of North Carolina in the years here in issue with the explanation that petitioner had failed to establish the fair market value of the manuscripts. OPINION Section 170, I.R.C. 1954, [5] provides that "There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. * * *" Section 1.170-1(c)(1), Income Tax Regs. states that: (c) Contribution in property--(1) General rules. If a contribution is made in property other than money, the amount of the deduction is determined by the fair market value of the property at the time of the contribution. The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. * * * [6]
Valuation is a factual question "to be resolved from a consideration and weighing of all the relevant evidence in the record." Philip Kaplan, 43 T.C. 663, 665 (1965). Petitioner's expert witness with respect to the value of the papers of petitioner's father was Gene M. Gressley, an archivist with a specialty in economic history of the American West. He gave as his opinion of the fair market value of the manuscripts donated by petitioner to Princeton University the following amounts for the years indicated: Year
Amount
1964
$10,200
1965
8,500
1966
9,350
1967 13,200
Total
$41,250 Respondent's expert witness, Joseph E. Molloy, is an appraiser of manuscripts for a Philadelphia auction house. He testified that in his opinion the fair market value of the manuscripts donated to Princeton University during all the years here in issue was the amount of $5,665.95. The evaluation of the letter books by petitioner's expert *31 was based primarily upon the theory that if the University of Wyoming were willing to expend 50 cents per page for copying costs, then the fair market value of the original manuscripts was at least twice that amount, or $1 per page. He valued the other materials on his knowledge of the market for collections of letters, maps, and other documents relating to the western part of the United States, which he referred to as "Western Americana." Respondent's expert based his evaluation upon his opinion of the amount a willing buyer would pay a willing seller gleaned from his many years of experience in appraising manuscripts for a Philadelphia auction house. In this case we have no evidence of the fair market value of comparable property or of any sales of similar property. Both parties recognize that while there is a market for property similar to the property here being valued, that market is very limited. We do not accept the reasoning of petitioner's expert witness that because the University of Wyoming was willing to pay 50 cents a page for copies of the letter books, the original of those books should be worth $1 a page. However, we do consider the fact that the University would *32 pay 50 cents a page for copies to be evidence bearing on the value of the letter books. Respondent's expert valued the collection on the basis of the subject matter with which the letter or other document dealt. Respondent's expert gave the highest value to papers dealing with the history of the dispute over the origin of Barringer Crater and the efforts made to mine ore from the crater on the theory that those papers would be of most interest to a potential purchaser. Respondent's expert gave little value to many of the letters written by petitioner's father which had only a marginal relation to his mining activities, and even less value to those letters dealing with subjects unrelated to mining which this witness grouped altogether as "personal" letters. Carrying out this system of valuation respondent's expert gave the same value to petitioner's father's correspondence with Woodrow Wilson as he did to routine letters with regard to strictly family matters. We have evaluated the testimony of all the witnesses and considered all the evidence of record. Based on the record as a whole, we concluded that the fair market value of the items donated to Princeton University in each of *33 the years here in issue was as follows: Year
Fair Market Value
1964
$5,200
1965
3,750
1966
4,100
1967
4,300
Respondent in his notice of deficiency apparently accepted the fact that the papers had been donated to Princeton during the years in issue but at the trial contended that since the documents were not physically in the possession of Princeton University during these years, there was no completed gift. This contention is not argued on brief by respondent but is again mentioned. The evidence clearly shows that Gressley was serving as the agent of Princeton University during the years in issue in receiving petitioner's gifts to Princeton. As both parties recognize, a completed gift may be made by delivery to the donee's agent. Brown, Personal Property, sec. 40, p. 94(2nd Ed.) Petitioner presented expert testimony by the director of the George Washington Flowers Memorial Collection of Southern Americana at Duke University who stated that in his opinion the fair market value of the papers of D. Moreau Barringer donated to the University of North Carolina in 1964 was $1,600 and the fair market value of those papers donated in 1966 was $270. Petitioner's *34 expert witness has been purchasing material relating to Southern Americana for 15 years. He stated that his opinions as to the value of the D. Moreau Barringer papers reflect what he would be willing to pay if the papers had been offered for sale to the Flowers Collection. On the basis of this testimony and the record as a whole, we conclude that the fair market value of the letters donated by petitioner to the University of North Carolina is the value as claimed by petitioner and testified to by his expert witness. Accordingly, we find that the value of the gifts made by petitioner to the University of North Carolina was $1,600 in the taxable year 1964 and $270 in the taxable year 1966. The final issue for our decision is whether the amount of $3,055.60 paid by petitioner in 1966 to a law firm constitutes an expense which petitioner may deduct under the provisions of section 642(h). [7] As we stated in Greggar P. Sletteland, 43 T.C. 602, 605 (1965): for petitioner to prevail in the instant case, at least three elements must be established: (1) The estate * * * must have had an excess of deductions over gross income; (2) the estate's year of termination must have *35 ended in [1966]; and (3) petitioner must have been a beneficiary succeeding to the property of [Sonia Converse Barringer's] estate. Petitioner contends that since the bill for legal services was submitted to and paid by him, he is entitled to the claimed deduction. When asked whether there were "liquid funds in the estate at the time of termination," petitioner replied, "I don't really remember." Petitioner on brief argues that he would not have personally paid the bill for legal services if the estate had income from which to pay it. In effect, petitioner asks us to assume a fact it is incumbent on him to prove. *36 There is no evidence in the record as to the income or deductions of the Estate of Sonia Converse Barringer in its last taxable year. If Federal income tax returns were filed for the estate, a fact not shown by the record, they were not offered in evidence. Because of the lack of proof that the deductions of the Estate of Sonia Converse Barringer exceeded the gross income of that estate for the taxable year 1966, respondent's determination with respect to this issue is sustained. Decisions will be entered under Rule 50. Footnotes
1. Cases of the following petitioners are consolidated herewith: Brandon and Diana Barringer, Docket No. 4568-69, and Brandon Barringer, Surviving Husband and Estate of Sonia C. Barringer, Deceased, Brandon Barringer, Executor, Docket No. 4569-69.↩
2. These folders contain no letters to petitioner's father from President Woodrow Wilson. The record indicates that in years prior to those here in issue petitioner had sent the letters to his father from Woodrow Wilson to Princeton.↩
3. The record indicates that a number of other letters to petitioner's father from President Theodore Roosevelt had been sent to Princeton in prior years.↩
4. The expert witness of each party testified that there were 51 letter books sent by petitioner to Gressley during the years in issue which he examined in making his evaluation of the documents. The lists of items sent during the years here in issue which petitioner testified included all items sent during these years show only 47 letter books sent during the years in issue. The four letter books referred to by the expert witnesses which we do not find the evidence to establish as being sent to Gressley during the years here in issue are the following: Two personal letter books of Daniel M. Barringer covering the period May 21, 1897 to May 21, 1898 and November 25, 1899 to March 5, 1901; one letter book relating to the El Pluton mine; and one letter book relating to the Federal Exploration Co., presumably the Federal Exploration Co. letter book No. 1. It is obvious that these letter books were sent to Gressley at some time since they had been sent to petitioner's attorney by Gressley shortly prior to the trial and were physically in the Courtroom during the trial and were examined by the expert witnesses. ↩
5. All statutory references are to the Internal Revenue Code of 1954 as amended. ↩
6. The restrictions imposed by sec. 170(e), I.R.C. 1954↩, as amended by sec. 201(a)(1) of Pub. L. 91-172 (Dec. 30, 1969).
7. Sec. 642(h) Unused Loss Carryovers and Excess Deductions on Termination Available to Beneficiaries.--If on the termination of an estate or trust, the estate or trust has -- (1) a net operating loss carryover under section 172 or a capital loss carryover under section 1212, or (2) for the last taxable year of the estate or trust deductions (other than the deductions allowed under subsections (b) or (c)) in excess of gross income for such year, then such carryover or such excess shall be allowed as a deduction, in accordance with regulations prescribed by the Secretary or his delegate, to the beneficiaries succeeding to the property of the estate or trust.↩