OTTO KERNER, JR., and ESTATE OF HELENA C. KERNER, DECEASED, OTTO KERNER, JR., EXECUTOR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Kerner v. Commissioner
Docket No. 4686-73.
United States Tax Court
T.C. Memo 1976-12; 1976 Tax Ct. Memo LEXIS 392; 35 T.C.M. (CCH) 36; T.C.M. (RIA) 760012; January 19, 1976. Filed T. E. Patton,J. L. Schulman, for the petitioners. D. J. Conlon, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined a deficiency in petitioners' 1969 Federal income tax of $12,025.09. The two issues for decision are: (1) whether certain papers donated by petitioner Otto Kerner in 1968 to the Illinois State Historical Library were his personal property or the public property of the State of Illinois, and (2) the fair market value of these papers on the date of donation. Petitioner Otto Kerner donated the papers in question to the Illinois State Historical Library in 1968 and claimed a charitable deduction of $24,736.89 on his joint 1968 income tax return. The statute of limitations has run on that return, and it is not in issue in this *393 case. Petitioners claim the total value of the donated papers is $73,375. On their 1969 return they claimed a charitable deduction carryover with respect to the papers of $21,658.17, which respondent has disallowed. This is the sum in issue in this case. Petitioners claimed a further charitable deduction carryover in 1970 which may be affected by the outcome of this case. Since we conclude herein that Otto Kerner's papers were not worth more than $24,000, the approximate amount of the charitable deduction claimed in 1968, there is no carryover charitable deduction available to petitioners in 1969, the year in issue. Having reached this conclusion, we find it unnecessary to consider the first issue, namely, whether the papers donated by Otto Kerner were his property or belonged to the State of Illinois. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Otto Kerner, Jr. and Helena C. Kerner, husband and wife, filed joint income tax returns for the years 1968 and 1969. At the time they filed their petition, they resided in Chicago, Illinois. Mrs. Kerner died subsequent to the filing of the petition, and her estate, with her husband as executor, has been *394 substituted as a party. Mrs. Kerner is a party only by virtue of having filed a joint income tax return with her husband, and Otto Kerner, Jr. is referred to hereinafter as petitioner. Petitioner was Governor of the State of Illinois from January 1961 to May 1968. His office generated a freshet of papers, records, memoranda, and writings of all varieties. One of the tasks of petitioner's staff was to analyze these papers and to segregate out those they deemed to be official. They selected as official papers approximately the same records that past Illinois governors had chosen. Although no law defined the composition of official records, his staff was guided in part by certain State statutes which required the Governor to transmit particular documents to the Secretary of State before the documents would have the force of law. Petitioner's staff disposed of official records in two ways. Records which required action by the Secretary of State before becoming law were immediately filed with the Index Division of the Secretary of State's office. The remainder of the records classified as official by petitioner's staff were sent to the Archives Division of the Secretary of State on *395 two different dates, March 4, 1966 and June 25, 1968. On December 2, 1968, petitioner executed a document titled "Instrument of Gift" in which he donated a variety of papers, not including any deemed official, to the Illinois State Historical Library. The papers were contained in 292 boxes. Each box contained approximately 2,400 pieces of paper, for a total of approximately 700,000 items. The bulk of the donation consisted of papers stemming from petitioner's years as Governor. These papers included (1) carbon copies of all outgoing letters, arranged alphabetically, (2) state department, agency, board, and commission communications, (3) legislative communications, (4) staff memoranda and minutes of cabinet meetings, (5) political campaign materials, (6) pamphlets and articles, and (7) appointment books, Christmas cards, invitations, and memoranda concerning his charitable activities. Petitioner also donated his papers stemming from his tenure as United States Attorney, his papers dating from his years as Cook County Judge, his personal working papers relating to his activities as chairman of the National Advisory Commission on Civil Disorders, and the papers of his deceased father, *396 Judge Otto Kerner, Sr. Petitioner claimed a charitable deduction for the donation of his papers in his 1968 Federal income tax return of $24,736.89. Respondent did not contest that deduction, and investigations into the taxable year 1968 are now barred by the statute of limitations. Petitioner claimed a charitable contribution carryover from 1968 in his 1969 income tax return of $21,658.17. Respondent disallowed this carryover in its entirety. ULTIMATE FINDING OF FACT The fair market value of the papers which petitioner donated to the Illinois State Historical Library is no greater than $24,000. OPINION The question presented is the fair market value of petitioner's papers on December 2, 1968, the date they were donated to the Illinois State Historical Library. Petitioner claims they were worth $73,375. Respondent asserts they were worth no more than $24,736.89, the amount claimed as a charitable deduction in connection with the donation of these papers on petitioner's 1968 income tax return. We agree with respondent. Section 1.170-1(c)(1), Income Tax Regs. *397 , provides that if a taxpayer makes a contribution to a properly qualified charitable organization, and the "contribution is made in property other than money, the amount of the deduction is determined by the fair market value of the property at the time of the contribution." Furthermore, fair market value is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Id. Such questions of valuation are fundamentally questions of fact. Philip Kaplan,43 T.C. 663, 665 (1965). The process of determining value is necessarily imprecise. Est. of David Smith,57 T.C. 650, 655 (1972), affd. 510 F. 2d 479 (2d Cir. 1975), with each case turning on its own facts. Morris M. Messing,48 T.C. 502, 512 (1967). Petitioner does not question the validity and applicability of the regulations. He claims to adopt the regulations' definition of fair market value, i.e., what a willing buyer would pay a willing seller. Petitioner, however, did not employ such a standard in arriving *398 at his conclusion as to value. During the latter part of 1968, petitioner retained Mr. Ralph Newman to appraise the value of the donated collection. Newman has had extensive experience in appraising the value of collections of papers of American public officials. Newman estimated the overall value of the collection to be $73,375, employing the following method to arrive at his conclusion: (a) He first estimated the total number of pieces of paper in the collection; (b) He then conducted a general review of the papers in the collection; (c) He concluded that the average minimum value of each page in the collection was ten cents; (d) He then multiplied the total number of pages by ten cents a page; (e) To this amount he added the value of certain letters and documents in the collection, such as presidential letters, which had a definitely ascertainable market value. Newman concluded that the average minimum value of each page of petitioner's papers was ten cents on the basis of several factors. He thought that ten cents was the cost of storing a page of petitioner's papers and, additionally, the cost of photocopying a page. Newman viewed the Illinois State Historical Society's *399 acceptance of the collection as a further indication that the per page value of the collection was at least a dime. However, even assuming the correctness of petitioner's estimates, petitioner has omitted the critical step. He has not shown that such factors would be considered by a potential purchaser. Reliance on copying and storage costs begs the initial question of whether anyone sufficiently values the collection to pay for the copying of it or to advance funds to purchase it and store it. [1] Cf. Douglas Goldman,46 T.C. 136, 138 (1966), affd. 388 F.2d 476 (6th Cir. 1967). Although an Illinois institution has accepted the collection and is expending funds to maintain it, it by no means follows that this institution or any other institution would have also been willing to advance funds to acquire ownership of the collection. [2] As a result, petitioner simply has not met his burden of establishing the fair market value of the collection. Rule 142, Tax Court Rules of Practice and Procedure; Bernard Goss,59 T.C. 594, 597 (1973). *400 Respondent employed its own appraiser, a Mr. Kenneth Rendell, to value petitioner's papers. Rendell is a highly qualified and experienced appraiser and dealer in documents and papers similar to the Kerner collection, having appraised, among numerous others, those of former Chief Justice Fred Vinson. He concluded that the fair market value of the collection could not possibly be more than $23,000 or $24,000 and would much more likely be sold for approximately $15,000. In making his appraisal, Rendell's first step was to determine whether there had been any recent sales of modern gubernatorial papers. He found none. He attempted, as an alternative, to estimate fair market value by defining the contents of the collection being offered for sale, the boundaries of the market for such a collection, and the intensity of demand by customers within the market boundaries. He assumed that the entire collection, comprising both gubernatorial and nongubernatorial papers, would be the object offered for sale. He next concluded that the only probable buyers were Illinois institutions interested in the State's politics, such as the Chicago Historical Society, the Illinois State Historical Library, *401 the University of Illinois, the Univeristy of Southern Illinois, and the University of Chicago. He gauged the intensity of market demand by analyzing the quality of the collection from the perspective of a potential institutional purchaser. Before making a judgment as to quality, he first became familiar with the collection, scanning every other box, reading in full several hundred items and skimming many others. He then ranked certain items from one to five, with "one" representing an item worth retaining but not photocopying, and with "five" representing prime quality material. He spent approximately two and one half days analyzing one half of the collection and another day analyzing the remainder. He concluded that the overall quality of the collection was poor because it did not provide insight into how petitioner created policy or made decisions. The papers failed to convey a feeling of the pulse and energy of petitioner while in office. Instead the collection mainly dealt with the everyday, mundane operations of the state government. Rendell thought that the collection contained a great amount of unnecessary items. We have considered Rendell's opinion along with all the other *402 evidence, and have concluded that petitioner has failed to prove the value of the papers at the time they were donated to the Illinois State Historical Library was greater than $24,000. In reaching the conclusion we have considered the following factors to be relevant: petitioner's accomplishments and general popularity; the significance of the specific papers in issue; the relative place and importance of the contributed papers in petitioner's career; the condition and content of the papers; whether the papers are originals or photocopies, are written in petitioner's own hand or typed; whether the mental processes of petitioner are shown; the composition of the market for these papers; and the intensity of demand among potential buyers. Cf. Maurice Jarre,64 T.C. 183, 188 (1975); William H. Mauldin,60 T.C. 749, 760 (1973). Decision will be entered for respondent.
Footnotes
1. In addition, the historical value of a collection is not necessarily indicative of its fair market value. Cf. William Fox,24 T.C.M. 1001↩, 34 P-H Memo. T.C. par. 65,195 (1965) (the scientific value of certain donated papers is not relevant to a determination of their fair market value).
2. This case thus differs from Brandon Barringer,31 T.C.M. 1149, 41 P-H Memo. T.C. par. 72,234 (1972). In Barringer the Court considered the fact that one university had decided to expend the funds necessary to make copies of papers which the taxpayer was donating to another university as helpful in determining fair market value. In Barringer,↩ the copying actually occurred and thus is analogous to a sale. In our case, no institution has undertaken such activity.