DOUGLAS GOLDMAN AND EVELYN K. GOLDMAN, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2726–64.   Filed April 25, 1966.

*Jerome Goldman*, for the petitioners.
*Richard M. Schwartz*, for the respondent.

MULRONEY, *Judge:* Respondent determined a deficiency in petitioners' 1961 income tax in the amount of $793.39.

The issues are whether petitioners are entitled to a deduction of $1,500 as a charitable contribution which consisted of bound copies of medical journals Douglas Goldman, who will be referred to as petitioner, contributed to a hospital, and whether they are entitled to a deduction of $71 as charitable contributions for various amounts petitioner paid to four charitable organizations where he received raffle tickets entitling him in each instance to drawings for valuable prizes.

### FINDINGS OF FACT

Some of the facts have been stipulated and they are found accordingly.

Petitioners are Douglas Goldman and his wife Evelyn K. Goldman, who live in Cincinnati, Ohio. They filed their joint income tax return for 1961 with the district director of internal revenue, Cincinnati, Ohio.

Petitioner is a licensed physician specializing in the practice of internal medicine and psychiatry. In 1961, in addition to his private medical practice, petitioner was employed by the State of Ohio as clinical director of Longview State Hospital, which is a hospital maintained by the State of Ohio for the treatment of the mentally ill.

Prior to the taxable year 1961, petitioner subscribed for the following medical journals:

| Title | Number of volumes | Years |
|-------|---------|-------|
| Archives of Internal Medicine | 42 | 1938–60 |
| American Journal of Medical Sciences | 34 | 1935–60 |
| Archives of Neurology and Psychiatry | 26 | 1946–59 |
| American Heart Journal | 24 | 1937–49 |
| American Journal of Medicine | 25 | 1948–60 |

In 1961 petitioner contributed the medical journals described above in bound form to the Good Samaritan Hospital in Cincinnati, Ohio, and claimed a charitable deduction for such contribution in the amount of $1,500. Good Samaritan Hospital is a charitable organization under section 170 (c) of the Internal Revenue Code of 1954.[1]

During the year 1961, petitioner paid the following amounts to the organizations set forth below in respect of which he received receipts, popularly called raffle tickets, which gave the petitioner in each instance a chance to win a valuable prize:

| Organization | Contribution |
|--------------|--------------|
| Good Samaritan Hospital | $50 |
| Jewish Community Center | 10 |
| Chofetz Chaim (Hebrew School) Bazaar | 10 |
| Cancer Aid | 1 |

Petitioner did not win any prizes in the drawings.

Respondent disallowed the above claimed deductions in full but now concedes petitioners are entitled to a deduction in the amount of the fair market value of the bound medical journals contributed to the hospital.

The fair market value of the 151 volumes of medical journals was not in excess of $415.50.

OPINION

Section 170(a) allows as a deduction a charitable contribution "if verified under regulations prescribed by the Secretary or his delegate." Sec. 1.170–1(c)(1) of the regulations provides that "If a contribution is made in property other than money, the amount of the deduction is determined by the fair market value of the property at the time of the contribution." The only question with respect to the deduction for the contribution to the Good Samaritan Hospital is the fair market value of the 151 volumes of medical journals petitioner gave to the hospital in November of 1961. The burden was on petitioner to establish the fair market value of the books.

---

[1] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.

Petitioner used a fair market value of approximately $10 a volume in computing his charitable deduction. He and one of his two expert valuation witnesses stated that it was their opinion the fair market value of the books was $10 or more a volume. However, almost no weight can be given to their opinions for they both said their valuation was based upon the subscription prices of the journals ranging from $7 to $12 a volume, plus binding costs, ranging from $5.50 to $6.50. While cost is often something to be considered in arriving at a valuation figure for some property, it is of little importance when the property consists of back numbers of a periodical and the cost figure used is the amount paid when the periodical was current. There is no evidence that these volumes increased in value because of age. In fact, the record shows that back journals become less important as research tools since the material therein becomes obsolete. Moreover, petitioner testified that at least two of the journals were received by him as a member of the American Medical Association and the subscription, which is the cost price he used, was included in his membership fee.[2] At any rate, both petitioner and his expert witness tied their opinions so closely to costs as to render them almost valueless as evidence of fair market value of back numbers of bound medical journals.

Petitioners' other expert witness was the medical center librarian at the University of Cincinnati. He testified only in rebuttal and he stated it was his opinion that the fair market value of the books was at least $10 a volume for all but the 25 volumes of the American Journal of Medicine and the latter were of the value of at least $12 a volume. He said he had never had any occasion to purchase such books and his valuation was based solely on book catalogs that he had seen put out by unnamed used-book dealers. No catalogs were produced.

The most persuasive evidence was the opinion of the proprietor of a bookstore in Cincinnati. He was called by respondent and he stated he had been in the business of buying and selling books, including such bound medical journals, for a period of approximately 35 years. He estimated he had sold around 2,000 volumes of medical journals, both bound and unbound. He said there was a slow market for such books as most libraries subscribe for these journals. He said he threw away over half a ton of unbound medical journals because when he listed them in catalogs that he sent to libraries he got no response. It fairly appears from his evidence that the only market for an individual owner of such books was a second-hand book dealer. He said such books are never sold over the counter in the store and seldom or

[2] It should be pointed out such dues are deductible either as charitable or business expenses. While the record does not show he took such deductions in the years he received the journals, he probably did, for his 1961 return shows a deduction "Dues, subscriptions $800.22."

never sold in any big run of volumes. He said the usual market is some medical library buying from a catalog seeking to replace one or two volumes that have been lost or damaged. He said he had personally prepared about 15 such medical catalogs that are submitted to medical libraries, hospital libraries, and other dealers. Sometimes he sold such medical journals to other dealers. He testified that around 1962 he had sold 40 volumes of Archives of Internal Medicine to another dealer for $75. This witness' opinion as to the fair market value of the books is as follows:

| Title | Volumes | Years | Fair market value per volume | Total fair market value |
|-------|---------|-------|------------------------------|-------------------------|
| Archives of Internal Medicine | 42 | 1938–60 | $2.50 | $105.00 |
| American Journal of Medical Sciences | 34 | 1935–60 | 2.50 | 85.00 |
| Archives of Neurology and Psychiatry | 26 | 1946–59 | 3.50 | 91.00 |
| American Heart Journal | 24 | 1937–49 | 3.00 | 72.00 |
| American Journal of Medicine | 25 | 1948–60 | 2.50 | 62.50 |
| Total | | | | 415.50 |

Because we feel the above is the best opinion of fair market value of the books in 1961 when they were donated to the hospital, we have made a finding to that effect in our findings of fact. In the Rule 50 computation petitioners will be given a charitable deduction of $415.50 with respect to the donation of these books to the hospital.

It is respondent's position that the cash payments made to various organizations (stipulated to be in the sum of $71) in respect of which petitioner received raffle tickets entitling him to drawings for valuable prizes, do not constitute charitable gifts within the meaning of section 170 of the Internal Revenue Code of 1954. He is clearly right. Such payments do not qualify as charitable contributions. A raffle is generally held to be within the general definition of a lottery. It is a disposal by chance of a single prize among purchasers of separate chances. See 54 C.J.S., Lotteries, sec. 10. Petitioner was not a contributor to the charitable organization when he bought its raffle ticket. He was merely purchasing that which the charitable organization had to sell, namely, chances for a valuable prize. We are not told what the prizes were but it is stipulated they were valuable prizes. The charitable organization selling raffle tickets was in effect disposing of its prize by sale and petitioner was paying a small portion of the purchase price and receiving the chance to receive the prize for his payment. He received full consideration and he got just what he paid for. He was not making a charitable contribution within the meaning of the statute.

*Decision will be entered under Rule 50.*