Ronald P. ANSELMO and Kay W. Anselmo, Petitioners-Appellants,

v.

COMMISSIONER, INTERNAL REVENUE, Respondent-Appellee.

No. 83–5569.

United States Court of Appeals, Eleventh Circuit.

April 16, 1985.

Ralph A. Muoio, Caplin & Drysdale, Chartered, Stafford Smiley, Washington, D.C., for petitioners-appellants.

Joel Gerber, Acting Chief Counsel, IRS, Michael L. Paup, Chief, Appellate Section, Glenn L. Archer, Jr., Asst. Atty. Gen., Ann B. Durney, Elaine F. Ferris, U.S. Dept. of Justice, Washington, D.C., for respondent-appellee.

Before TJOFLAT and VANCE, Circuit Judges, and ATKINS *, District Judge.

* Honorable C. Clyde Atkins, U.S. District Judge for the Southern District of Florida, sitting by designation.

TJOFLAT, Circuit Judge:

This "charitable contribution" tax case presented the Tax Court with a classic battle of experts on the issue of the fair market value of the donated property, 461 low-quality Bolivian gems. The Commissioner's experts valued the gems as if they had been sold in bulk to a manufacturer of jewelry; the taxpayers' experts valued the gems as components of finished pieces of jewelry sold at retail. The Tax Court found that a different market was the most appropriate one for assessing fair market value and, concluding that neither side had rebutted the presumption of correctness accorded the value established by the Commissioner's notice of deficiency, rejected the expert opinions on both sides. The taxpayers now appeal.

I.

Ronald P. Anselmo, one of the taxpayers, is an attorney in Fort Lauderdale, Florida. In early 1977, Robert Karoly, an investment advisor with R.G. Wilson & Co., Inc., of Fort Lauderdale, offered to sell Anselmo a tax shelter involving the taxpayer's purchase and subsequent donation of semiprecious stones to charity. Karoly claimed that the shelter produced a tax deduction of more than five times the stones' original cost, on account of the disparity between the South American wholesale price of the stones, where they are mined and cut, and the retail price of the stones in the United States. Karoly explained that an individual could purchase loose stones at the South American wholesale price, and after holding them for nine months, could claim a charitable deduction for them based on the retail price of jewelry in the United States.

The idea appealed to Anselmo. On March 3, 1977 he agreed to purchase $15,000 worth of stones through R.G. Wilson & Co., Inc. On March 21 or 22, 1977, Wilson's agent bought 461 large, low-quality gems in Bolivia on Anselmo's behalf. The purchase consisted of 443 amethysts, six-teen aquamarines, one bicolor tourmaline and one blue topaz. The stones, collectively, weighed 3,337 carats. Anselmo acquired title to them at the time of purchase.

Wilson delivered the stones to Anselmo in Fort Lauderdale in May 1977. It also provided him with three separate written appraisals, each valuing the stones, collectively, at $80,679.70. Anselmo thereafter asked Dr. Joel Arem, a recognized authority on gems, to confirm the stones' appraised value. Dr. Arem placed their retail market value at $81,915.

Each of these appraisers followed the same path of reasoning to arrive at the fair market value of the stones. First, they assumed that a stone's fair market value was the price at which it sold in a retail jewelry store. But these stores usually do not carry low quality, unset gems. Instead, such stones are sold, after being incorporated into finished pieces of jewelry such as rings and pendants, by catalog and discount stores and jewelry stores catering to less selective customers. The appraisers therefore estimated the retail value of a stone by calculating the portion of a finished jewelry item's retail price that could be attributed to the gem; specifically, they subtracted the scrap metal value of the setting from the jewelry item's retail price.

On December 30, 1977, Anselmo donated all 461 gems to the National Museum of Natural History, Smithsonian Institution, in Washington, D.C. The Smithsonian decided to use the stones as study or laboratory pieces, rather than exhibit stones, because of their poor quality.

On their 1977 joint tax return, Anselmo and his wife, Kay Anselmo, the other taxpayer in this case, claimed a charitable deduction for $80,680, the fair market value of the stones on the date of the gift, pursuant to section 170(a)(1) of the Internal Revenue Code. 26 U.S.C. § 170(a)(1) (1982).[1] Because of the percentage limita-

---

1. 26 U.S.C. § 170(a)(1) (1982) provides:

 **§ 170. Charitable, etc., contributions and gifts**

 **(a) Allowance of deduction**

 **(1) General rule**

 There shall be allowed as a deduction any charitable contribution ... payment of which is made within the taxable year. A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary.

tion on charitable deductions, the Anselmos limited the amount of their 1977 deduction to $43,357 and carried the unused portion over to 1978. *See* 26 U.S.C. § 170(b)(1) (1982).

The Commissioner filed a notice of deficiency, dated August 8, 1980, which placed the fair market value of the donated stones at $16,800, rather than $80,680, and reduced the Anselmos' tax deduction accordingly. This new amount corresponded roughly to the Anselmos' cost of the stones plus the cost of the subsequent appraisal by Dr. Arem. The Anselmos petitioned the Tax Court for a redetermination of the resulting deficiencies (which were in the amount of $12,874 and $19,207 for the years 1977 and 1978, respectively). In response to this petition, the Commissioner claimed an increased deficiency because IRS appraisers valued the stones on the contribution date at only $9,295.

 At trial the only issue for the tax court to decide was the proper calculation of the Anselmos' deduction under section 170(a)(1) of the Code. The applicable treasury regulation provided that, where "a charitable contribution is made in property other than money, the amount of the contribution is the fair market value of the property at the time of the contribution." Treas.Reg. § 1.170 A–1(c)(1) (1982). In applying this standard, the court presumed the Commissioner's determination of fair market value in the notice of deficiency to be correct. *Helvering v. Taylor*, 293 U.S. 507, 513–14, 55 S.Ct. 287, 290, 79 L.Ed. 623 (1935); *Southwestern Life Insurance Co. v. United States*, 560 F.2d 627, 635 (5th Cir.1977), *cert. denied*, 435 U.S. 995, 98 S.Ct. 1647, 56 L.Ed.2d 84 (1978). Under

Rule 142(a), Tax Court Rules of Practice and Procedure, the Anselmos had the burden of proving that the valuation should have been higher than that stated in the notice of deficiency, 26 U.S.C. fol. § 7453 (1982).[2] Because the IRS sought an increased deficiency, it had the burden of proving a lower valuation. *Reiff v. Commissioner*, 77 T.C. 1169, 1173 (1981). Both sides offered extensive expert testimony. Their respective witnesses generally agreed on the size and overall poor quality of the stones. Therefore, the dispute focused primarily on establishing the relevant market for the purpose of appraising the stones' fair market value.

The two sides differed dramatically on the fair market value of the stones. The Anselmos' experts fixed the value of the stones between $60,788 and $81,915 while the Commissioner's witnesses appraised them at somewhere between $8,878.54 and $8,945.05. The major reason for this discrepancy was the market the experts assumed in valuing the stones. The Anselmos' experts assumed that the gems were mounted in typical finished jewelry items and sold in retail stores. They valued each gem by determining the portion of a piece of jewelry's retail price that represented the value of the gem. The Commissioner's experts, on the other hand, valued the gems on the assumption that the 461 stones would be sold together to a single jewelry manufacturer or retail jeweler who would use them in the manufacture of finished pieces of jewelry. Such a large bulk sale would involve a discount from the usual price.

The parties offered considerable evidence on the chain of distribution of low quality,

In 1977, the Code required that the taxpayer own semi-precious stones for at least nine months before their donation to charity in order for the full fair market value to be deductible. *See* 26 U.S.C. § 170(e) (1982). The taxpayers satisfied this prerequisite in the instant case.

**2.** The taxpayer's burden of proving that the Commissioner's determination was arbitrary or erroneous is an outgrowth of the general rule

that deductions are a matter of legislative grace and a taxpayer must clearly establish his entitlement to a particular deduction. *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440, 54 S.Ct. 788, 790, 78 L.Ed. 1348 (1934); *C.A. White Trucking Co. v. Comm'r*, 601 F.2d 867, 869 (5th Cir.1979).

unset colored stones to support their choice of the relevant market for appraisal purposes. The experts agreed that these gems pass through many hands on the trip from the mine to the retail customer and that each hand receives generous compensation for its part in the journey. The stones are mined and cut in Brazil. Under the general pattern, the stones are sold to exporters who in turn sell them to importers in the United States. The stones then pass through several layers of wholesalers, distributors, and jobbers. Manufacturing jewelers eventually purchase the stones and mount them in settings, many of which are precast to fit standard size stones. The manufacturing jeweler sells the finished jewelry item to jewelry or department stores, either directly or through middlemen. The retailers' markup alone typically runs between one hundred and three hundred percent of the cost of the jewelry item. On occasion, jewelry stores will buy lower quality gems before they are set in jewelry and offer them for sale directly to the public or complete the manufacturing process themselves. The vast majority of such low quality stones, however, are made into rings, pendants, or other jewelry before being delivered to the individual purchaser.

The court concluded that the Commissioner's experts were correct in assuming that the gems would be marketed to retail and manufacturing jewelers. Therefore, the stones should have been valued with reference to the price paid by the jewelry manufacturers instead of a portion of the price paid by consumers for finished jewelry items. The court rejected these experts' opinions, however, because they improperly assumed that the gems would be sold as a group, at a substantial discount, rather than individually. The Commissioner therefore failed to rebut the presumed correctness of the fair market value stated in the notice of deficiency. The court also rejected the opinions of the taxpayers' experts. Their retail market, in which the buyer and seller bargained over the portion of the price of a finished jewelry item attributable to the stone, did not exist. Thus having found that the most relevant market was the one in which the stones would sell individually to retail and manufacturing jewelers and that none of the experts had an opinion as to the value of the taxpayers' stones in that market, the court concluded that the presumption of correctness that attached to the Commissioner's assessment of the notice of deficiency had not been overcome by either party.

The Anselmos appeal, contending that the Tax Court erred as a matter of law by deciding to value the gems in the market where jewelry manufacturers purchase loose stones instead of the market posited by their appraisers. The Anselmos argue that the estate and gift tax treasury regulations defining fair market value require that the latter market be utilized. They further contend that, because loose gems are not generally sold to consumers in the retail market, the Internal Revenue Code required the Tax Court to measure the stones' retail price by calculating the portion of the retail sales price of the jewelry item reasonably attributable to the gem, as opposed to the mounting.

## II.

■ Section 170(a)(1) of the Internal Revenue Code provides that "[t]here shall be allowed as a deduction any charitable contribution ... payment of which is made within the taxable year." 26 U.S.C. § 170(a)(1). As stated previously, the regulation directs that "the amount of the contribution [of property other than money] is the fair market value of the property at the time of the contribution." Treas.Reg. § 1.170A–1(c)(1) (1982). The regulation defines fair market value as the "price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Treas.Reg. § 1.170A–1(c)(2) (1982). With the relevant

statutory language and these regulations[3] firmly in mind, we focus our attention on the Anselmos' first claim on appeal, that the Tax Court erred as a matter of law by failing to value the gems as their appraisers did, in the retail market where jewelry items are sold to consumers.

■ We begin our assessment of the Anselmos' claim by rejecting their assertion that the Tax Court's selection of the relevant marketplace for valuation purposes is a question of law. The proper market for valuation purposes is a question of fact, and the Tax Court's finding will be set aside on appeal only if clearly erroneous.[4] This conclusion is compelled by the treasury regulations cited above, for they contemplate a valuation process occurring in the context of an "efficient" market where both buyers and sellers possess reasonable knowledge of the relevant facts and act in a rational manner. In such a market, an item may only have a single price at a given time. The commodities markets and the stock exchanges are examples of such efficient markets. Two separate trading prices for the same item will never exist (unless an error occurs) because the rational buyer will always trade at the lower price. Therefore, the selection of the relevant market at a given time for appraisal purposes is tantamount to selecting the price. The value of an item is a question of fact; accordingly, the relevant market must also be a question of fact rather than a question of law.

■ Treating the Tax Court's selection of the relevant market as a question of fact, we turn to the Anselmos' contention that the court erred by not valuing the gems in the retail jewelry market. As we have indicated, the applicable treasury regulation defines fair market value as the "price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Treas. Reg. § 1.170A–1(c)(2) (1982). The Anselmos suggest that the Tax Court was clearly erroneous in rejecting their expert opinion testimony that property recently purchased for $15,000, which was at or above the prevailing price, would change hands for $80,680, absent a general increase in the price of such property. Their suggestion bears no merit. Common sense tells us that a sale of the Anselmo gems between a reasonable buyer and seller, both with knowledge of the relevant facts, would never occur at a price above $15,000, because the buyer would have the option of purchasing equivalent stones directly from R.G. Wilson & Co., Inc. for that amount.[5]

■ The Anselmos argue that the tax court should have applied the federal estate and gift tax regulations to ascertain the fair market value of property for charitable contribution deduction purposes. We are not persuaded. Nothing in the Internal

3. Treasury regulations must be followed unless unreasonable or plainly inconsistent with the Internal Revenue Code. *National Muffler Dealers Ass'n v. United States,* 440 U.S. 472, 476–77, 99 S.Ct. 1304, 1307, 59 L.Ed.2d 519 (1979); *United States v. Cartwright,* 411 U.S. 546, 550, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528 (1973).

4. The Tax Court's findings of fact, like those of the district court, are subject to the "clearly erroneous" standard of review. *Brannen v. Comm'r,* 722 F.2d 695, 701 (11th Cir.1984); *Steffens v. Comm'r,* 707 F.2d 478, 482–83 (11th Cir. 1983). In this case, the evidence was more than sufficient to support the court's findings.

5. Revenue Ruling 80–69, 1980–1 C.B. 55–56, addresses the position the Anselmos would have us adopt as follows: "The best evidence of fair market value depends on actual transactions and not on some artificially calculated estimate of value contrary to the prices at which the very gems at issue changed hands in the marketplace." *See also* Rev.Rul. 80–233, 1980–2 C.B. 69; Rev.Rul. 80–329, 1980–2 C.B. 70.

A revenue ruling does not have the effect of a regulation or a statute. It is entitled to weight, however, because it expresses the studied view of the agency whose duty it is to carry out the statute. *Propstra v. United States,* 680 F.2d 1248, 1256 (9th Cir.1982); *Stubbs, Overbeck & Assoc. v. United States,* 445 F.2d 1142, 1146–47 (5th Cir.1971); *Miami First Nat'l Bank v. United States,* 443 F.2d 475, 478 (5th Cir.1971), *cert. denied,* 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971); *Propstra v. United States,* 680 F.2d 1248, 1256 (9th Cir.1982).

Revenue Code or the regulations indicates that this would be appropriate.

Rules governing valuations for charitable contributions of property are distinguishable from valuations in the estate and gift context because the taxpayer has the opposite incentives in the two situations: the taxpayer wants to reduce the value of property for estate and gift tax purposes but, as here, the taxpayer wishes to inflate the value of property for charitable donation purposes. The estate and gift tax regulations are aimed at preventing abusive undervaluation of property; the regulations governing charitable contributions are not. In the usual case, however, there should be no distinction between the measure of fair market value for estate and gift tax and charitable contribution purposes. *Cf. Champion v. Commissioner*, 303 F.2d 887, 892–93 (5th Cir.1962). We thus address the gift and estate regulations as an accommodation to the Anselmos' argument.

The estate tax treasury regulation governing the fair market value of property provides, in pertinent part:

> The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. The fair market value of a particular item of property includable in the decedent's gross estate is not to be determined by a forced sale price. Nor is the fair market value of an item of property to be determined by the sale price of the item in a market other than that in which such item is most commonly sold to the public, taking into account the location of the item wherever appropriate. Thus, in the case of an item of property includable in the decedent's gross estate, which is generally obtained by the public in the retail market, the fair market value of such an item of property is the price at which the item or a comparable item would be sold at retail. For example, the fair market value of an automobile (an article generally obtained by the public in the retail market) includable in the decedent's gross estate is the price for which an automobile of the same or approximately the same description, make, model, age, condition, etc., could be purchased by a member of the general public and not the price for which the particular automobile of the decedent would be purchased by a dealer in used automobiles.

Treas.Reg. § 20.2031–1(b) (1965), *see* Treas. Reg. § 25.2512–1 (1965) (gift tax regulation).

The same primary standard for measuring an item's fair market value applies in both the estate and gift tax and charitable contribution contexts: the price struck by "a willing buyer and a willing seller ... both having reasonable knowledge of relevant facts." Undeniably, the Anselmos may not qualify for an increased valuation under this classic standard.

The Anselmos request us to focus on the estate and gift tax regulation's discussion of the relevant market for valuation purposes. They contend that the gems must be valued in the market "in which such item is most commonly sold to the public." *Id.* The "public" in the case at hand is, as a matter of law, the retail consumer who buys jewelry containing low quality gems. It is indisputable that such consumers usually buy this type jewelry from discount houses or less selective jewelry stores. Accordingly, their argument continues, the Tax Court erred by not valuing the stones as the portion of the jewelry's retail price attributable to the stones.

■ The major flaw in this argument, as the Tax Court pointed out, is that the "public" refers to the customary purchasers of an item. The most appropriate purchaser of an item is not invariably the individual consumer. For example, the general buying public for live cattle would be comprised primarily of slaughterhouses rather than individual consumers. The fair market value of live cattle accordingly would be measured by the price paid at the livestock auction rather than at the supermar-

ket. In this case, the Tax Court found the "public" for low quality, unmounted gems to be the jewelry manufacturer and jewelry stores that create jewelry items, rather than the individual consumer. Therefore, even assuming *arguendo* that the estate and gift tax regulations apply, the Tax Court still valued the property correctly.

AFFIRMED.