JAMES and HELEN M. LAMPE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lampe v. Commissioner
Docket No. 24777-82.
United States Tax Court
T.C. Memo 1985-236; 1985 Tax Ct. Memo LEXIS 394; 49 T.C.M. (CCH) 1505; T.C.M. (RIA) 85236; May 16, 1985. *394 Held, fair market value of gemstones contributed to charity determined. John G. Truelson, for the petitioners. James E. Archie, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined a deficiency in the petitioners' Federal income taxes of $11,012 for 1979. The sole issue for decision is the fair market value of nine gemstones donated by the petitioners to a museum. *395 FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioners, James and Helen Lampe, husband and wife, maintained their legal residence in Fort Worth, Tex., at the time the petition in this case was filed. They filed a joint Federal income tax return for 1979 with the Internal Revenue Service. Dr. Lampe will sometimes be referred to as the petitioner. The petitioner is a dentist, specializing in orthodontics, in Fort Worth, Tex. Prior to the fall of 1978, he had invested in real estate, stocks, and bonds, but he had not invested in colored gemstones; an engagement ring was the only gemstone previously purchased by the petitioner. Dr. Lampe and no knowledge of or experience in dealing in gemstones. In the fall of 1978, the *396 petitioner learned of the possibility of buying gemstones through a Dr. Ellis, a doctor who practiced in the same building as the petitioner. Dr. Ellis introduced the petitioner to Bob Grove, a representative of Orion Mining Limited. Mr. Grove advised the petitioner that he had gemstones available of a very good quality and that these gemstones could be purchased at prices far below their retail value because Mr. Grove could obtain the stones directly from the mine in Brazil. At this first meeting, Mr. Grove told the petitioner that an appraisal of the gemstones' retail value, at an amount in excess of their purchase price, would accompany the stones. He also advised the petitioner that the stones could be held for investment, put into jewelry, sold to a jewelry store, or donated to charity and a charitable contribution taken. The petitioner was not provided with any written promotional materials or contracts. On December 22, 1978, Dr. Lampe purchased 9 individual gemstones from Mr. Grove for about $4,500. [1] The gemstones were of the following types and sizes: Gemstone
Approximate weight
One oval-cut kunzite
68.56 carats
One cushion-cut kunzite
42.50 carats
One oval-cut amethyst
11.69 carats
Three pear-cut amethysts
9.62, 10.88,
and 10.96 carats
One emerald-cut aquamarine
15.47 carats
Two oval-cut almandite garnets
2.88 and 3.72
carats
*397 Mr. Grove obtained the gemstones from Gemservice, Inc., a company located in Brazil. At the time the petitioner purchased the stones in December 1978, he received from Mr. Grove a written appraisal, prepared by Joel E. Arem and postdated to November 28, 1979, which valued the stones at $22,023.30. The petitioner did not secure an independent appraisal of the value of the stones before he purchased them or before he donated them. After he received the gemstones, Dr. Lampe placed them in a safe in his office. There is no evidence that the petitioners insured the stones. The petitioners never attempted to sell the stones. On December 31, 1979, the petitioners donated the gemstones to the Fort Worth Museum of Science and History (the Fort Worth Museum). The Fort Worth Museum was an organization described in *398 section 170(c) of the Internal Revenue Code of 1954, [2] and the donation qualified as a charitable contribution under section 170(c). On their 1979 income tax return, the petitioners claimed a charitable contribution deduction of $22,023 with respect to the donation of the gemstones. The amount of the claimed deduction was based upon the appraisal of Mr. Arem provided by the seller of the stones. In his notice of deficiency, the Commissioner disallowed the entire deduction attributable to the gift of the stones. In December 1979, the market consisting of sales of loose gemstones by dealers to manufacturing retail jewelers was the most common market for sales to ultimate consumers of stones like those donated by the petitioners. [3] Manufacturing retail jewelers are the most common ultimate consumer of stones of this type, size, and quality; they obtain loose gemstones from dealers, set them into mountings, and then sell the finished piece of jewelry to the public. In a small percentage of sales, the manufacturing retail jeweler may also allow *399 a customer to select loose stones, which are then mounted by the jeweler in a setting also selected by the customer. Gemstones like those donated by the petitioners are not commonly sold to serious gem collectors or to the public as loose gemstones to be held for investment; all nine of the petitioners' stones are suitable only for setting into jewelry. However, gemstones of this type are not commonly sold to jewelry manufacturers (manufacturers who mount stones into settings and sell the preset jewelry to jewelry stores or department stores) because the stones are not sufficiently similar in size or quality and are not sufficient in quantity. OPINION The sole issue for decision is the fair market value on December 31, 1979, of 9 gemstones donated by the petitioners to the Fort Worth Museum. Section 170(a)(1) allows a deduction for any charitable contribution made in *400 the taxable year. If a charitable contribution is made in property other than money, the amount of the contribution is the fair market value of the property at the time of the contribution. Sec. 1.170A-1(c)(1), Income Tax Regs. Fair market value is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Sec. 1.170A-1(c)(2), Income Tax Regs.; see United States v. Cartwright,411 U.S. 546 (1973). In determining the fair market value of the donated gemstones, we must look to the price at which they would change hands in the most common market in which there is an ultimate consumer for such stones. Skripak v. Commissioner,84 T.C. 285 (1985); Anselmo v. Commissioner,80 T.C. 872, 881-883 (1983), affd. 757 F.2d 1208 (11th Cir. 1985); see sec. 20.2031-1(b), Estate Tax Regs.; sec. 25.2512-1, Gift Tax Regs. [4]; Goldman v. Commissioner,388 F.2d 476, 478 (6th Cir. 1967), affg. 46 T.C. 136 (1966). *401 The determination of the gemstones' fair market value is a question of fact to be resolved from a consideration of all relevant evidence in the record. See Tripp v. Commissioner,337 F.2d 432, 434 (7th Cir. 1964), affg. a Memorandum Opinion of this Court; McGuire v. Commissioner,44 T.C. 801, 807 (1965). The petitioners have the burden of proving the fair market value of the gemstones. Rule 142(a), Tax Court Rules of Practice and Procedure; Welch v. Helvering,290 U.S. 111 (1933). The petitioners have abandoned their claim that the gemstones had an aggregate value of $22,023.00; instead, they rely upon a valuation of $10,415.00, supplied by their expert witness, Richard G. Kubes. Likewise, the Commissioner no longer contends that the petitioners are entitled to no charitable deduction; *402 he maintains that the gemstones had a value of $3,140.95 if grouped and appraised as a single parcel of 9 stones or, alternatively, that the gemstones had an aggregate value of $3,157.68 if grouped in 5 parcels. The Commissioner's valuation is based on the opinion of his expert witness, Elly Rosen. The wide disparity in the values placed on the stones by the experts is due chiefly to the fact that the experts valued the gemstones in different markets. Mr. Kubes is a jeweler employed by Kubes Jewelers, Inc. (Kubes Jewelers), a high-quality, manufacturing retail jewelry store located in Fort Worth, which was opened by Mr. Kubes' father about 38 years ago. Mr. Kubes is a graduate gemologist of the Gemological Institute of America (GIA). He earned the graduate gemologist title in 1980 upon the completion of a correspondence course and a residency. Mr. Kubes also teaches a non-credit course on gemstones and their appraisal at Texas Christian University. At the time of trial, he had been appraising gemstones for a total of about 10 years, and he was employed in the buying and selling of stones in the period 1978 through 1980. Mr. Rosen, the Commissioner's expert, is also a graduate *403 gemologist of the GIA. In addition, Mr. Rosen is a senior member of the American Society of Appraisers (ASA) and a fellow (FGA) of the Gemological Association of Great Britain. He teaches a course on the appraisal of gems and jewelry for the continuing education department of Yeshiva University, and as the National Education Chairman for the International Society of Appraisers, Mr. Rosen, along with five other ASA members, developed an appraisal training program, which is offered by Indiana University. Mr. Rosen has also lectured before several professional appraisal societies on the subjects of appraisal science and the evaluation of colored gemstones. From 1976 through 1978, Mr. Rosen was employed by a gemstone dealer (wholesaler) as manager of its colored stone division. From 1979 through 1981, he was employed by a manufacturing retail jeweler, where he was charged with appraising its entire inventory of loose gemstones, purchasing new inventory, and selling finer loose gems and finished jewelry to the public.Since 1982, Mr. Rosen has been self-employed as a gemological appraisal consultant. Of the two experts, only Mr. Rosen was asked to value the gemstones in the most common *404 market in which there was an ultimate consumer of the stones. He testified that although the greatest number of transactions in stones of the type donated by the petitioners normally occurs between dealers in colored stone, the dealers purchase the loose stones for the purpose of resale and therefore are not ultimate consumers. He determined that the ultimate consumers of stones of this type are manufacturing retail jewelers because the stones would most commonly be mounted in jewelry, and because the manufacture of the jewelry would be carried out by retail jewelers rather than jewelry manufacturers due to the disparate size and quality of the stones involved. Consequently, Mr. Rosen valued the stones at "wholesale,"[5] i.e., at the price at which they would change hands between dealers and manufacturing retail jewelers. Mr. Kubes, on the other hand, valued the stones at "retail," i.e., at the price at which they would be sold by retail jewelers to the public. Mr. Kubes selected the retail market only because, as a retail jeweler, he felt most comfortable in appraising the stones at their retail value. *405 We have found as a fact that the ultimate consumers of stones like those donated by the petitioners are manufacturing retail jewelers. In so finding, we have relied primarily on the testimony of Mr. Rosen, but his opinion was corroborated in several respects by the testimony and experiences of Mr. Kubes. For example, Mr. Kubes testified that he did not recommend kunzite or almandite garnet to serious gemstone collectors because kunzites tend to fade and almandite garnets are insufficiently rare to be valuable. Furthermore, although he testified that Kubes Jewelers had sold loose stones like the petitioners' to its customers, he also stated that of the loose stones sold by Kubes Jewelers (about 10 to 15 percent of all sales), approximately 70 percent were then mounted in jewelry by Kubes Jewelers. Thus, Mr. Kubes' testimony supported Mr. Rosen's opinion that these types of stones are most commonly set into jewelry, not purchased loose by serious collectors or investors.Our conclusion that retail jewelers are the ultimate consumers of stones like these is unaffected by the fact that, occasionally, a retail customer in a store like Kubes Jewelers may personally select a loose stone *406 and have the merchant set it in a mounting which is also individually selected. As we stated in Anselmo v. Commissioner,80 T.C. at 882 n. 11, "We view this practice as a distinction without a difference since it is a piece of jewelry which is sold to the customer." There is absolutely no evidence in the record that stones like the petitioners' are commonly sold loose to the public to be held as loose stones. Therefore, because Mr. Kubes' valuation of $10,415 is based on retail prices, it must be disregarded in determining the fair market value of the gemstones. Although Mr. Kubes' appraisal report and the bulk of his testimony rested on a retail valuation of the stones, he did testify that if he, as a retail jeweler, were buying these stones in a unforced situation, he would pay about $5,500 at wholesale. [6] Mr. Rosen was of the opinion that the stones had an aggregate fair market value on December 31, 1979, of $3,140.95 or $3,157.68, depending on whether the stones were purchased as a single parcel of 9 stones or as 5 different parcels containing a total of 9 stones. He also stated that there would be no significant difference in the total value of the stones *407 if the stones were sold individually, stone by stone. The valuation of gemstones is inherently difficult, even when the appropriate market is selected, due to the wide disparities in price available within a particular gemstone market and the consequent disparities, often exceedingly large, in expert appraisals. Confronted with opinion evidence that is necessarily inexact, we have recently relied upon cost--as determined by the sale of the same gemstones within a short period of time prior to the valuation date--where it is the more reliable evidence of value. See Chiu v. Commissioner, 84 T.C.     (April 15, 1985). [7]We are not bound by the opinion of any expert witness when that opinion is contrary to our own judgment. Barry v. United States,501 F.2d 578 (6th Cir. 1974); *408 Tripp v. Commissioner,supra.
In the present case, cost is the most reliable evidence of value. Both experts were well qualified to determine the quality of the gemstones, and both used appropriate instruments to aid in their examination, yet they disagreed on the relative quality of these stones. Mr. Kubes testified that all were above average in quality for the particular type of stone examined; whereas, Mr. Rosen testified that all would be either below-average or only average in quality. Furthermore, the experts, both of whom had purchased stones from dealers during 1979, estimated the aggregate wholesale value of the stones at prices lying above and below the price which Dr. Lampe paid, $4,500. The difference of opinion between the experts may reflect the fact that prices in the wholesale market vary widely, even "wildly" to use Mr. Kubes' own description. There is no evidence that the petitioner's acquisition of the stones in 1978 was at a price *409 not reflective of the appropriate dealer to jeweler (or wholesale) market, and there is no reason to believe that he received a discount from the price that would have been paid by a retail jeweler. Dr. Lampe testified that he was told by Mr. Grove that the stones were being sold directly by a mine in Brazil. However, Mr. Grove did not testify, and there is no evidence that Orion Mining Limited or Gemservice, Inc., represented a mine. Although the petitioner did buy the stones in a bulk purchase, and the donated items must be valued on an individual basis (Chiu v. Commissioner,supra; Anselmo v. Commissioner,supra), the Commissioner's expert testified that the price would not vary significantly if the stones were sold as a parcel or stone by stone. Furthermore, there is no persuasive evidence that the value of the stones appreciated significantly during the period between the time of their purchase in 1978 and the time of their donation in 1979. Mr. Kubes did discuss changes in the values of stones around 1978 and 1979, but his testimony was confusing and failed to establish clearly that there was any appreciation in the value of colored gemstones *410 from 1978 to 1979. On the basis of the entire record, we conclude that the fair market value of the 9 gemstones on December 31, 1979, was the cost of the property to the petitioner, $4,500. Decision will be entered under Rule 155.
Footnotes
1. Dr. Lampe testified that he paid "$4,400-some-odd" for the gemstones. In his proposed findings of fact, the Commissioner has given the petitioner the benefit of the "some-odd" portion of the purchase price and has conceded that he paid about $4,500 for the gemstones. The petitioners did not object to this proposed finding of fact, and therefore, we have adopted it.↩
2. All statutory references are to the Internal Revenue Code of 1954 as in effect during the year in issue.↩
3. See Anselmo v. Commissioner,80 T.C. 872, 876-877 (1983), affd. 757 F.2d 1208↩ (11th Cir. 1985), for a more extensive discussion of gemstone markets and the chain of distribution.
4. The test of fair market value for estate and gift tax purposes is generally the same as that for charitable contribution deduction purposes. United States v. Parker,376 F.2d 402, 408 (5th Cir. 1967); Anselmo v. Commissioner,80 T.C. 872, 881 (1983), affd. 757 F.2d 1208↩ (11th Cir. 1985).
5. We employ the words "wholesale" and "retail" in their colloquial sense--as did the parties and the witnesses--to refer to sales by gemstone dealers (wholesale) and to sales by jewelry stores (retail). We recognize that, technically, gemstone dealers are the actual retailers of gemstones of the type donated by the petitioners and that jewelry stores, as the ultimate consumers of the stones, are the buyers at retail. See Anselmo v. Commissioner,80 T.C. 872, 878 n. 7 (1983), affd. 757 F.2d 1208↩ (11th Cir. 1985).
6. It is not clear from Mr. Kubes' testimony whether the $5,500 figure is the price that he would have paid in Dec. 1979 or at the time of trial, Feb. 1984. However, if it is the latter, we may assume that his valuation would be higher if made as of Dec. 1979 because he stated that gemstone prices were higher in 1979 than in 1984.↩
7. Theodotou v. Commissioner,T.C. Memo. 1985-181; Talebi v. Commissioner,T.C. Memo. 1985-180; cf. Price v. Commissioner,T.C. Memo. 1985-182↩.