JOSEPH J. TALLAL, JR., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; JOSEPH J. TALLAL, JR. and PEGGY P. TALLAL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Tallal v. Commissioner
Docket Nos. 28975-82, 28976-82.
United States Tax Court
T.C. Memo 1986-548; 1986 Tax Ct. Memo LEXIS 66; 52 T.C.M. (CCH) 1017; T.C.M. (RIA) 86548; November 12, 1986. *66 Ps purchased a large quantity of Government surplus bandage packages and subsequently donated them to the American Red Cross. Held: (1) The appropriate market for determining the fair market value of the bandage packages is that market composed of institutional buyers of large quantities of bandage packages; the fair market value of such packages is determined. (2) Ps are liable for the additional interest under sec. 6621(d), I.R.C. 1954. Robert K. Dowd, for the petitioners. Val J. Albright, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined the following deficiencies in the petitioners' Federal income taxes: Petitioner
Year
Deficiency
Joseph J. Tallal, Jr.
1977
$3,924.00
Joseph J. Tallal, Jr.
1978
54,435.00
Joseph J. Tallal, Jr. and
1979
44,669.00
Peggy P. Tallal
After concessions, the issues for decision are: (1) What was the fair market value of bandage packages donated by the petitioners to the American Red *69 Cross in 1979, and (2) whether the petitioners are liable for additional interest under section 6621(d) of the Internal Revenue Code of 1954[1] with respect to the underpayment of tax attributable to a valuation overstatement. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioners, Joseph J. Tallal, Jr., and Peggy P. Tallal, husband and wife, resided in Dallas, Texas, at the time they filed their petitions in this case. Mr. Tallal filed his individual Federal income tax returns for 1977 and 1978 with the Internal Revenue Service Center in Austin, Texas. Mr. and Mrs. Tallal filed their joint Federal income tax return for 1979 with the Internal Revenue Service Center in Austin, Texas. Mr. Tallal is a self-employed personal financial manager. In addition, he is an active investor in real estate and "just about anything where I think I can buy something and hold it for a period of time and sell it for a profit." In 1978, he was placed on the list of parties eligible to purchase government surplus *70 items. Shortly after being placed on the list, Mr. Tallal and two acquaintances were presented with the opportunity to buy a large quantity of government surplus bandage packages from Raven Industries in Chicago, Illinois. Each package consisted of a plastic bag containing an 18 inch X 22 inch absorbent bandage pad, six nickel-plated safety pins approximately 1-1/2 inches long, and two rolls of gauze bandage approximately 6 inches wide by 15 feet long. Each package also contained a stamp indicating that it was sterile until opened. Although the exact age of the packages has not been determined, the manufacturer, Johnson & Johnson, stopped producing that particular type in 1955. The group purchased 1,200 cases of the bandage packages; Mr. Tallal's share was 400 cases, or 9,600 bandages. He paid $1,500 or 15.6 cents per package. He did not take possession of the packages himself; rather, he arranged to have them stored in a warehouse. He paid a total of $233 to store the packages. Mr. Tallal purchased the bandages with the intent of selling them for a profit. He engaged Joel Pugh, a certified public accountant with contacts in the medical community, to sell the bandages for *71 him. Despite Mr. Pugh's efforts, the bandages remained unsold 9 months later. One organization contacted by Mr. Pugh in his search for a buyer was the American Red Cross. The Red Cross declined to purchase the bandages, but asked instead that Mr. Tallal donate them to the organization. He did so in December 1979. Mr. Tallal paid $810 to ship the bandages from the warehouse where they were stored to the Red Cross in New York City. When the Red Cross realized that Mr. Tallal might donate the bandages, it sought to determine how the organization might best use such a large donation. The Red Cross found that it could not use all the bandages in New York City, since it lacked the capacity to store them. Therefore, the donated bandages were distributed to three groups. Some cases were sent to each of the 43 local chapters of the Red Cross in the greater New York area. In addition, 35 volunteer ambulance corps operating in New York City each received three cases of bandages. The remaining cases were given to the New York City Emergency Medical Service (EMS), which provides the City with emergency ambulance service. At the time of the donation, Mr. Tallal had not established the *72 value of the bandages. However, Joel Pugh later received a letter dated March 7, 1980, from Angelo R. Cinti, an assistant manager with the American Red Cross in Greater New York, which read in relevant part, "We have been informed by Deputy Chief Shallash of the Emergency Medical Service that the price of the Burn Bandages retail for $4.75 to $5.75 depending on the vendor." Mr. Tallal obtained an additional appraisal from Johnson & Johnson, which placed a higher value on the bandages than did the Red Cross. The Tallals used a value of $4.75 when computing the amount of the charitable contribution for purposes of their 1979 joint Federal income tax return. Therefore, they calculated their total charitable contribution deduction to be $45,600. Because of the limitation imposed by section 170 (b)(1)(C)(i), the Tallals claimed a charitable contribution deduction of 30 percent of their adjusted gross income, or $27,650, in 1979. The remaining $17,950 was available to be carried forward to future years. During the Commissioner's examination of the Tallals' 1979 joint Federal income tax return, the petitioners produced checks totaling $1,693 to establish the cost of the donated bandages. *73 Therefore, in his notice of deficiency, the Commissioner allowed the Tallals a charitable contribution deduction of $1,693. In his brief, the Commissioner conceded that the petitioners were entitled to an additional $850, for a total deduction of $2,543. The Commissioner amended his answer to claim additional interest under section 6621(d) on the underpayment of tax attributable to a valuation overstatement. OPINION The primary issue for decision in this case is what was the fair market value of the bandage packages when donated by the petitioners to the American Red Cross. Section 170(a)(1) allows a deduction for any charitable contribution to or for the use of an organization described in section 170(c) payment of which is made during the taxable year. It is undisputed that the American Red Cross qualifies as such an organization. Section 1.170A-1(c)(1), Income Tax Regs., provides that if the gift is made in property other than money, the amount of the contribution is the fair market value of the property at the time of the contribution, reduced as provided in section 170(e)(1).[2]Section 1.170A-1 (c)(2) of the regulations defines fair market value as "the price at which *74 the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts." See United States v. Cartwright,411 U.S. 546 (1973); McShain v. Commissioner,71 T.C. 998, 1004 (1979). Fair market value is a question of fact to be determined from an examination of the entire record. Skripak v. Commissioner,84 T.C. 285, 320 (1985); Zmuda v. Commissioner,79 T.C. 714, 726 (1982), affd. 731 F.2d 1417 (9th Cir. 1984); Jarre v. Commissioner,64 T.C. 183, 188 (1975). The petitioners bear the burden of proving that the Commissioner's determination of the fair market value of the bandages is in error. Rule 142(a), Tax Court Rules of Practice and Procedure; Welch v. Helvering,290 U.S. 111 (1933). *75 Although section 170 and the regulations promulgated thereunder are silent as to the market to be used in determining the value of donated property, it has been recognized that the valuation test for charitable contribution deduction purposes is generally the same as that used for estate and gift tax purposes. United States v. Parker,376 F.2d 402, 408 (5th Cir. 1967); Anselmo v. Commissioner,80 T.C. 872, 881-884 (1983), affd. 757 F.2d 1208 (11th Cir. 1985). Section 20.2031-1(b), Estate Tax Regs., and section 25.2512-1, Gift Tax Regs., provide that the fair market value of an item of property is to be determined in the market in which such item is "most commonly sold to the public." Section 20.2031-1(b), Estate Tax Regs., provides in relevant part as follows: Thus, in the case of an item of property * * * which is generally obtained by the public in the retail market, the fair market value of such an item of property is the price at which the item or a comparable item would be sold at retail. For example, the fair market value of an automobile (an article generally obtained by the public in the retail market) * * * is the price *76 for which an automobile of the same or approximately the same description, make, model, age, condition, etc., could be purchased by a member of the general public and not the price for which the particular automobile * * * would be purchased by a dealer in used automobiles. * * * All relevant facts and elements of value as of the applicable valuation date shall be considered in every case. * * * In determining the fair market value of the donated bandages, we must look at the price which would be paid by the "retail customer who is the ultimate consumer of the property." Anselmo v. Commissioner,80 T.C. at 882. An "ultimate consumer" is deemed to be a customer who does not hold the item for subsequent resale. See Goldman v. Commissioner,388 F.2d 476, 478 (6th Cir. 1967), affg. 46 T.C. 136 (1966). In preparing their return, the Tallals calculated the amount of their charitable contribution using the value assigned to the bandages by the Red Cross. They have offered the letter written by Angelo Cinti of the Red Cross to Joel Pugh, Mr. Tallal's accountant, to support their claim.At trial, the letter was admitted only for the purpose *77 of proving that the Tallals received such a letter. We hold that its admissibility is limited to that extent, and that it may not be admitted to prove that the value of the bandages was indeed between $4.75 and $5.75. The letter contains two statements -- the statement from Deputy Chief Shallash notifying Mr. Cinti of the value of the bandages and the statement from Mr. Cinti informing the Tallals of this valuation. Mr. Shallash and Mr. Cinti did not appear as witnesses at the trial. Such documentary evidence constitutes multiple hearsay (Fed. R. Evid. 801(c)) and is not admissible to prove the truth of the matters stated therein, unless each statement falls into one of the exceptions to the hearsay rule (Fed. R. Evid. 802 - 805). The petitioners have pointed to no exception, and we can find none, which would allow the contents of this letter to be admitted into the record. Since we find that the letter sent by the Red Cross is inadmissible to prove the fair market value of 9,600 packages of bandages donated by the petitioners, we must look to other evidence contained in the *78 record to establish their value. We are guided by the testimony of four witnesses. The Tallals offered the testimony of Jeffrey A. Turcotte and James W. P. Alexander IV. The Commissioner offered William T. Stiles and Hobart W. Treadway. Mr. Turcotte has been employed by a number of pharmaceutical and medical-supply companies. He began as a salesman and advanced into product management and market research positions. As a product manager, one of his duties involved responding to customer requests for price quotations. In arriving at a price quotation for a particular item, he examined existing products or specifications supplied by a customer, determined the cost of acquiring, assembling, packaging, and sterilizing the necessary parts, and then priced them for sale. In 1981, Mr. Turcotte was asked by Mr. Pugh to render a price quotation for the bandage packages. Mr. Turcotte agreed to do so, even though his employer did not sell the bandage packages and even though he was unfamiliar with them. In arriving at a price quotation, he used the same procedure he would use to determine the price of other products. He quoted Mr. Pugh a price of $6.47 per package, for an order of 2,400 *79 packages. This price included the cost of the materials, overhead, and the cost of sterilizing the package. At trial, he estimated that the price quoted by him was approximately 8 to 10 percent higher than it would have been in 1979. Mr. Alexander has been employed in the emergency medicine field since late 1976. From December 1976 to November 1981, he worked as a first aid specialist for the American Red Cross in New York City. After leaving the Red Cross, he worked as an administrator for EMS. He also has served as a volunteer with a community-based volunteer ambulance corps. Mr. Alexander testified that the bandage packages were used either by the Red Cross in their first aid training classes or by ambulance crews for treating accident victims. In fact, he had used some himself while riding the volunteer ambulance. He testified that since the donated bandages were still in their original packages, they were assumed to be sterile, although he was not certain that they were in fact sterile. In any event, bandages which were not sterile were still used for training by the Red Cross. At the time of the donation, the Red Cross in New York City did not have the funds to buy *80 these bandages for use in its training classes. Students therefore were required to provide their own materials. Mr. Alexander testified that students typically spent $4 or $5 to buy "a few" rolls of gauze and a 4 inch X 4 inch version of the bandage pad. Mr. Alexander also testified as to what EMS was paying for bandage packages similar to those donated by the petitioners. He testified that EMS bought bandages through competitive bidding and that it was "probably paying in the area of $4.75 to $5.75" per bandage package in 1979. He came to this conclusion after reviewing old EMS purchase orders for such purchases before he testified at trial. Mr. Alexander was not employed by EMS in 1979. He was not the custodian of EMS's purchase records. He did not produce any purchase orders or invoices at trial. [3]
*81 Mr. Stiles has been employed since 1979 at the Texas A & M Veterinarian Teaching Hospital (Texas A & M) as an assistant hospital administrator. His duties included handling the purchasing of supplies for the hospital. He produced two invoices from Raven Industries which showed that the hospital had purchased a large quantity of bandage packages in 1977 identical to the ones purchased by Mr. Tallal. One invoice was dated September 30, 1977, and showed a purchase of 10,080 packages at a price of 27.5 cents per package, including delivery. The second invoice was dated October 7, 1977, and showed a purchase of 288 packages at the same price. The purchases were made after the hospital received competitive bids from various vendors. Mr. Stiles testified that Texas A & M did not receive any educational discount for these purchases. He had no record of any such purchases by the hospital in 1979. Mr. Stiles testified that the bandages purchased by the hospital were used as "leg wrap" for horses. He understood that the bandage packages purchased by the hospital were still sterile, but he admitted that since the bandages were not placed directly on an open wound, the hospital was not *82 concerned with whether they were sterile. He acknowledged that the same product could have a different price depending on its use, and that the price of a bandage used on humans could be significantly higher than that of one used on horses. The Commissioner's final witness was Mr. Treadway. At the time of trial, Mr. Treadway had been employed at the Veterinary Medicine Teaching Hospital at the University of Illinois as a hospital administrator for approximately 7 years. He testified that the hospital also stocks bandages similar to those donated to the Red Cross for use as leg wraps for horses. He produced invoices of recent purchases by the hospital. The purchases may be summarized as follows: Date
Units
Unit Cost
Aug. 25, 1978
360
$ .75, including delivery
July 13, 1979
360
.787, including delivery
July 3, 1980
480
1.00, excluding delivery
July 30, 1981
600
.835, excluding delivery
Since the purchases by the University of Illinois involved relatively small amounts, they were not made after competitive bidding. Mr. Treadway was certain that the purchases included the 18 inch X 22 inch absorbent bandage pad; he was not sure that the *83 university had purchased the entire package, including the rolls of gauze and the safety pins. He did not know whether the bandage packages purchased by the university were sterile. Finally, he too was aware of the difference in prices between bandages to be used on humans and those to be used on horses. He recognized that prices for bandages to be used to treat humans could be several times higher than those for horses. In determining the fair market value of the bandage packages, we must first identify the market in which the bandages are "most commonly sold to the public" and ascertain the price paid for them in such market. See sec. 20.2031-1(b), Estate Tax Regs.; Anselmo v. Commissioner,80 T.C. at 882. The identification of the appropriate market for valuing the bandage packages is the principal difficulty in this case. In identifying the market, we must bear in mind that we are dealing with a gift of 9,600 bandage packages, that the packages were approximately 25 years old, and that such bandage packages were being sold as government surplus property. The most comparable purchase was by Texas A & M on September 30, 1977, approximately one year before *84 the purchase by the petitioners. It purchased 10,080 bandage packages for 27.5 cents each. These packages contained the same components as did those purchased by the Tallals. They were purchased from the same vendor and in almost the same quantity. Texas A & M bought them after competitive bids were received. On the other hand, the evidence offered by the petitioners (the purchases by EMS, by students in Red Cross training classes, and by various ambulance corps in New York City) involved purchases that were not comparable. EMS, the ambulance corps, and the students purchased bandages which were brand new and almost surely sterile. These bandages were often purchased in very small quantities from retail stores. On this record, we find that the relevant market for valuing the bandage packages donated by the Tallals was composed of institutional buyers which purchase them in large quantities. The petitioners argue that the market in which both Texas A & M and the Tallals themselves purchased the bandage packages was not the appropriate market for determining fair market value. They claim that the packages were government surplus items and were bought at a bargain price. They *85 contend that the market for government surplus items is one not accessible to the general public. They argue that for such reason we should not base the valuation on the prices in such market. Such argument is unpersuasive. Mr. Tallal may have indeed purchased the packages at a favorable price. However, there is no evidence that there were burdensome restrictions on the market which would have prevented any member of the general public from doing the same. There is no evidence indicating that gaining access to this market required more than placing one's name on a list.Furthermore, the purchases by Texas A & M and the University of Illinois show that other large purchasers had access to the market. The petitioners further urge that we disregard the purchase by Texas A & M as evidence of the fair market value of the donated packages on the ground that Texas A & M used its bandages as leg wraps for horses, whereas the bandages donated to the Red Cross were used on humans. They argue that this different use entitles them to a fair market value over 17 times that of the bandages purchased by Texas A & M. In our judgment, the Tallals have greatly over-emphasized this distinction. *86 The bandage packages donated to and used by the Red Cross and EMS are identical to those used by Texas A & M. Texas A & M purchased its bandage packages after competitive bidding; thus, another purchaser could have acquired the same bandage packages for the price paid by Texas A & M, regardless of the use to be made of the bandages. There was no reason to pay more for the bandage packages merely because they were to be used for humans. Moreover, although the petitioners assume that the bandage packages given by them to the Red Cross were sterile and that the bandage packages purchased by Texas A & M were not sterile, the petitioners have failed to prove such difference: Mr. Stiles understood that the bandages purchased by Texas A & M were sterile, and certainly the evidence does not indicate that they were not sterile. Mr. Alexander's testimony shows that some of the bandage packages given to the Red Cross were considered to be sterile, but he recognized that others may not have been. Having found that the relevant market for determining the fair market value of the bandage packages donated by the Tallals was composed of institutional buyers of large quantities of such packages, *87 we must examine the evidence of purchases in that market. We have evidence of two purchases in such a market -- the purchase by Texas A & M on September 30, 1977, of 10,080 bandage packages for 27.5 cents per package and the purchase by Mr. Tallal's group in September 1978 of 28,800 bandage packages for 15.6 cents per package.[4] The Commissioner argues that the price paid by the Tallals is the most accurate measure of the package's fair market value. It is true that the cost of property is ordinarily strong evidence of its fair market value. See, e.g., Chiu v. Commissioner,84 T.C. 722, 736 (1985). However, we believe that such cost should not be determinative in this case. Mr. Tallal was a member of a group which purchased almost 29,000 bandage packages. It is reasonable to infer that Mr. Tallal would have had to pay a higher price had he purchased his share of the bandage packages separately. For this reason, we believe that the price paid by Texas A & M for a purchase of 10,080 bandage packages is a more accurate measure of value than the price actually paid by Mr. Tallal. *88 The price paid by Texas A & M of 27.5 cents per package must, however, be adjusted to reflect the true fair market value of the bandage packages at the time of the donation. The value of the packages must be increased to account for the effects of inflation. Texas A & M bought its packages on September 30, 1977. The Red Cross received the donated packages in December 1979. During this period of time, the Consumer Price Index for All Items rose 19.8 percent. Therefore, the value of the bandage packages should be increased to 33 cents per package to reflect this change. Finally, the Tallals are entitled to deduct their expenses incurred in storing the bandage packages and delivering them to the Red Cross. These expenses were $1,043. Thus, we hold that the total allowable charitable contribution deduction attributable to the bandage packages is $4,211. The remaining issue for decision is whether the value assigned to the bandage packages by the Tallals on their 1979 joint Federal income tax return represents a valuation overstatement, within the meaning of section 6659, so as to make them liable for additional interest under section 6621(d) for the resulting underpayment of *89 income tax. The Commissioner has not claimed an addition to tax under section 6659. Section 6659(c) provides that a valuation overstatement exists if the fair market value of the property claimed on any return is 150 percent or more of the amount determined to be the correct fair market value of the property. In this case, a valuation overstatement clearly exists. The Tallals claimed the value of the donated bandage packages to be $45,600. We have determined their fair market value, including storage and shipping, to be $4,211. The Tallals have overvalued the bandages by more than 150 percent. Section 6621(d) provides for an increased rate of interest equal to 120 percent of the interest otherwise payable on an underpayment of tax in excess of $1,000 attributable to a tax motivated transaction. Valuation overstatements fall within the definition of tax motivated transactions. Sec. 6621(d)(3)(A)(i). The increased rate applies to interest accruing after December 31, 1984, even if the valuation overstatement occurred prior to that date. Solowiejczyk v. Commissioner,85 T.C. 552, 555-556 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). *90 In this case, a valuation overstatement exists with respect to the donated bandage packages. Therefore, an increased rate of interest under section 6621(d) is applicable for the underpayment of tax attributable to such overvaluation. Decisions will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.↩
2. Sec. 170(e)(1) provides that the amount of a charitable contribution resulting from the gift of property shall be calculated by reducing the fair market value of the property at the time of the gift by that amount which would not have been long-term capital gain if the property had been sold at its fair market value by the taxpayer. Essentially, sec. 170(e)(1) limits the deduction for contributions of ordinary income and short-term capital gain property to the property's adjusted basis. The Commissioner has made no claim that sec. 170(e)(1) is applicable in this case.↩
3. The Commissioner objected to Mr. Alexander's testifying to the prices paid by EMS for similar bandage packages on the grounds that the purchase orders were not available in the courtroom and that Mr. Alexander was not the custodian of the records. The petitioners argue that they had attempted to arrange for a witness to travel from New York to Dallas to present evidence concerning the prices paid by EMS for similar bandage packages and that Mr. Alexander had been sent to give such testimony. They argued that the testimony should be admitted under Federal Rules of Evidence 804(b)(5)↩ since the testimony presented is more probative of the fact than any other evidence that could reasonably be obtained. Under the circumstances, we have decided to admit the testimony.
4. Mr. Treadway also testified that the University of Illinois purchased bandages similar to those donated by the Tallals. However, he was not certain that the university purchased the entire package, containing the absorbent bandage pad, safety pins, and rolls of gauze. In addition, the university purchased only small quantities of bandages. For these reasons, we shall not rely upon the purchases by the university. Nevertheless, the bandages purchased by the university were similar enough to those donated by the Tallals to reinforce our conclusions concerning the market to be used and the appropriate valuation.↩