William B. AKERS and Jo Ann Akers, Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

No. 85–1127.

United States Court of Appeals, Sixth Circuit.

Argued March 4, 1986.

Decided Aug. 20, 1986.

Mark H. Westlake (argued), Tune, Entrekin & White, Nashville, Tenn., for petitioners-appellants.

Fred T. Goldberg, Jr., Chief Counsel, I.R.S., Michael L. Paup, Chief, Appellate Section, Tax Div., Dept. of Justice, Washington, D.C., Glenn L. Archer, Jr., Asst. Atty. Gen., Richard Farber, Michael J. Roach (argued), for respondent-appellee.

Before LIVELY, Chief Judge, and JONES and NELSON, Circuit Judges.

PER CURIAM.

Mr. & Mrs. William B. Akers gave to a charity a "scenic easement" burdening some 1340 acres of land they own in Cheatham County, Tennessee. Their appraiser concluded that the easement had a fair market value of $772,000, and they used that valuation in determining their charitable deductions for federal income tax purposes. The Internal Revenue Service disallowed the deductions, and the Akers petitioned the Tax Court for relief. On the basis of an appraisal made by a witness for IRS, the Tax Court concluded that the easement had a fair market value of $114,000. Tax deficiencies were determined accordingly, and the Akers have appealed the Tax Court's decision. We are not persuaded that the Tax Court's valuation was errone-ous, and we shall therefore affirm the decision.

## I

Most of the Akers' acres were acquired through the purchase, in 1965, of a large parcel of unimproved land known as the Treanor Tract. That tract, the timber on which had recently been cut, contains approximately 1,261 acres. It is adjacent to a parcel subdivided in 1963 into 600 lots (called "Ranchettes" by the subdivider), each containing only a few acres. Between 1970 and 1977, the Akers supplemented their holdings by purchasing 31 Ranchettes containing a total of approximately 82 acres.

The Treanor Tract consists of wooded ridges and hollows, with some creek-bottom farmland. The Akers build an A-frame vacation house on the tract in 1969, and Mr. Akers' brother built a similar house there in 1973. The houses have septic tanks and are supplied with water from wells on the property.

In 1977 the taxpayers granted a scenic easement over the land to a public charity called the Tennessee Conservation League. "The easement was granted for the scenic enjoyment of the public as well as the conservation and protection of the natural environmental systems on the property." *William B. Akers*, ¶ 84,490 P-H Memo TC (1984) at 1964-84. The easement provides, among other things, that only one family dwelling unit can be erected for each 200 acres, and that there can be no excavation, topographical changes, or removal of trees without permission of the Conservation League.

The grant of the easement was a "charitable contribution" within the meaning of 26 U.S.C. § 170(c). The regulations provide that "the amount of the contribution is the fair market value of the property," and "[t]he fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable

knowledge of the relevant facts." 26 C.F.R. § 1.170A–1(c)(1) and (2).

The parties agreed that the value of the scenic easement was to be measured by "the difference between the fair market value of [the Akers' acreage] immediately before the scenic easement was granted and the fair market value of the property immediately after the scenic easement was granted." *William B. Akers, supra,* at 1968–84. That approach was adopted by the Tax Court. The only element in this calculation as to which there is any significant dispute is the pre-easement value of the Treanor Tract. The parties are basically in agreement on its post-easement value, on the value of the two A-frame houses, and on the pre-easement and post-easement value of the 31 Ranchettes.

The price at which the Akers bought the Treanor Tract in 1965 was $125,000, or slightly under $100 per acre. In 1969 the Cheatham County Tax Office appraised the property for real estate tax purposes at $196,480. IRS offered two appraisal reports at the trial, one of which—that of Dennis H. Donovan—was accepted by the Tax Court as fixing the proper value of the easement. Mr. Donovan put the pre-easement value of the Treanor Tract, exclusive of buildings, at $505,000, or approximately $400 per acre. The taxpayers' appraiser, Mr. B.B. Doubleday, Jr., almost doubled Mr. Donovan's figure; Mr. Doubleday said the pre-easement value was $971,000, or approximately $770 per acre.

Both appraisers relied on comparable sales, but they disagreed over what sales were comparable. Mr. Donovan identified two large tracts, each containing over 1,000 acres and both in the same area as the Akers' acreage, one of which had been sold in December of 1973 at an estimated $279 per acre, exclusive of buildings, and the other of which had been sold in February of 1979 at an estimated price of $536 per acre, exclusive of buildings. Mr. Donovan considered these the "most comparable" sales and gave them the most weight in arriving at his $400 per acre appraisal.

The taxpayers' evidence showed that but for the grant of the easement, the Treanor Tract could readily have been subdivided into 24 lots averaging 52.5 acres each. Appraiser Doubleday looked for sales of lots comparable to these 24 theoretically subdivided lots, and he discovered 13 more or less comparable sales at prices averaging $770 per acre. Mr. Doubleday considered that figure most representative of the pre-easement value of the Treanor Tract.

The difference between the two valuations thus boils down to a difference between the worth of the Treanor Tract prior to subdivision and the worth of the land at some point afterwards. It is rather like the difference between the worth of a gravid or potentially gravid sow and the post-partum worth of sow-cum-shoats.

## II

It would not be appropriate to place undue emphasis on semantics, but we note in passing that the regulatory definition of fair market value speaks of "the" price at which "the" property would change hands between "a" willing buyer and a willing seller. It is indisputable that the Treanor Tract was a single property immediately prior to the grant of the easement, and the regulatory definition does suggest that the appropriate question is what a hypothetical Malcolm Forbes would have paid for it as one tract, rather than what two dozen hypothetical yuppies would have paid for it as 24 "Ranchettes."

The legal precedent that we find most helpful, and that we elect to follow, is *Anselmo v. Commissioner of Internal Revenue,* 757 F.2d 1208 (11th Cir.1985). The taxpayer in that case had bought several hundred low-quality South American gemstones for $15,000. After holding them for nine months (the gestation period then required for producing "capital gain property" that could be contributed to charity on a fully tax deductible basis), the taxpayer donated the stones to the Smithsonian Institution and claimed a charitable deduction of more than $80,000. The taxpayer's appraiser theorized that the value

of the stones should be determined by reference to the retail market. Because such stones are not normally retailed unmounted, the appraiser looked to the retail price of finished pieces of jewelry containing such stones, deducted the scrap value of the mountings, and treated what was left as the fair market value of the stones. The Tax Court rejected that approach, holding that the stones should have been valued at what a jewelry store owner or jewelry manufacturer would have paid for unmounted stones of comparable quality. The Court of Appeals for the Eleventh Circuit affirmed, treating the question of which market was relevant for valuation purposes as a question of fact, not a question of law. The Tax Court's finding that the individual consumer does not normally purchase low-quality gems unmounted was not clearly erroneous, the Court of Appeals held, and the Tax Court therefore did not err in rejecting a valuation determined by reference to a market where unmounted gems are seldom sold.

In the case at bar the Tax Court has determined that the market most appropriately used in estimating the value of the Treanor Tract is the market for large tracts of over 1,000 acres, and not the market for properties averaging less than a tenth that size. Far from being clearly erroneous, that determination seems clearly correct.

The person who goes shopping for a 50 acre parcel of land resembles, in some respects, the person who goes shopping for a finished item of jewelry. The "ultimate consumer" of jewelry does not normally have the time, inclination, or expertise to buy a low-quality gem and have a piece of jewelry designed and built around it. The "ultimate consumer" of a 50 acre lot, similarly, does not normally have the time, inclination, expertise or capital to buy a tract of land 10 or 20 times as big as the one he wants, with a view to subdivision and sale of the excess.

The significance of the large amount of capital required for purchase of the Treanor Tract as a whole may come into clearer focus when we consider the amount of time likely to be consumed in dividing the property into 24 lots and disposing of those lots individually. That is not the kind of marketing project that can be completed overnight. The testimony in this case established that it took 16 years for the subdivider of the land adjacent to the Treanor Tract to sell substantially all of the subdivided lots. Those lots were, to be sure, much smaller and more numerous than the lots into which the Treanor Tract would have been divided, but it is not unrealistic to suppose that several years—and a fair amount of professional and quasi-professional effort—might have been consumed in disposing of two dozen Treanor Tract lots at anything like $770 per acre. During that time, of course, there would always have been a risk that the market might turn, and the market for raw land does sometimes turn down, as recent experience shows, as well as up. Such considerations strongly suggest that the Tax Court was correct in accepting a valuation based on sales of tracts comparable in size to the Treanor Tract, rejecting a valuation based on prices commanded by much smaller lots.

Taxpayers cite *Estate of Elizabeth Schultz Rabe*, ¶ 75,026 P-H Memo TC (1975), for the proposition that a large tract of land (470.5 acres in that case) should be valued as if subdivided. There, however, the subdivision analysis was used only as a means of double-checking a valuation figure arrived at by another type of analysis. Unlike appraiser Doubleday, moreover, the appraiser who used a subdivision analysis in *Estate of Rabe* did attempt to factor in the costs of subdividing the property and holding it for sale over a period of time.

"While [the appraiser] could find no substantially similar properties, he considered the differences and similarities between each sale of similar properties and the subject property and made proper adjustments. He placed primary reliance on this method, but double checked his conclusions through a computation based on a subdivision analysis of the property. This latter computation was

detailed and utilized the present value of the expected gross return (based on a gross profit of 100 percent on raw land sales), discounted for a ten-year holding period. He used sales prices and development costs based on those of other similar subdivisions in the area." ¶ 75,-026 P–H Memo TC at 75–117.

It remains to be considered whether the decision in *Goldman v. Commissioner of Internal Revenue,* 388 F.2d 476 (6th Cir. 1967), requires us to reverse the decision of the Tax Court here. The property that was given to charity in *Goldman* consisted of 151 bound volumes of various medical journals. One of the questions presented to the Tax Court was whether the fair market value of the books was the price that an ultimate consumer could be expected to pay for them or the price that would be paid by a dealer purchasing the books for resale. The Tax Court stated that the books should be valued at retail rather than at wholesale, but accepted a relatively low valuation offered by an IRS witness who seems to have contradicted himself on whether he was giving the books a retail value or a wholesale value. In declining to overturn the Tax Court's determination as "clearly erroneous," thus rejecting the taxpayer's claim that the books had been undervalued because of the Tax Court's putative use of an irrelevant market, this court stated:

"We hold that where a deductible charitable contribution is made in property other than money, the allowable deduction is the fair market value computed on the price an ultimate consumer would pay, and that what might be paid by a dealer buying to resell is not a proper consideration." 388 F.2d at 478.

The affirmance of the Tax Court's decision in *Goldman* does not require a reversal of the Tax Court's decision here. The books that were given away in *Goldman* had already been "subdivided," in effect. Unlike the unmounted gems in *Anselmo,* and unlike the undivided Treanor Tract, the medical books were ready for immediate sale in the retail market and were not so expensive as to suggest that no retail buy-er for them could have been found. The statement of the grounds on which *Goldman* was decided may have been broader than necessary, but given the facts in *Goldman,* the holding in that case does not undermine the decision reached by the Tax Court here. We consider the Tax Court's decision correct, and it is hereby AFFIRMED.