T.C. Memo. 2001-141

UNITED STATES TAX COURT

JERROLD E. ARBINI AND HELEN C. ARBINI, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 11324-98.                    Filed June 15, 2001.

<u>Michael P. Casterton</u>, for petitioners.

<u>James R. Robb</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

RUWE, <u>Judge</u>:  Respondent determined deficiencies in
petitioners' Federal income taxes and penalties as follows:

|  |  | Accuracy-Related Penalty |
| <u>Year</u> | <u>Deficiency</u> | <u>Sec. 6662</u> |
| 1993 | $44,235 | $8,847 |
| 1994 | 13,133 | 2,627 |

After concessions,[1] the issue for decision is whether petitioners are entitled to charitable contribution deductions under section 170[2] for 1993 and 1994 in the amounts of $126,605 and $50,513, respectively, for the donation of newspapers made in 1991 to the San Francisco Academy of Comic Art.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The first stipulation of facts, second stipulation of facts, third stipulation of facts, and the attached exhibits are incorporated herein by this reference. Petitioners, Mr. Arbini (hereinafter petitioner) and Mrs. Arbini, resided in Bozeman, Montana, and Red Bluff, California, respectively, at the time they filed their petition.

On April 12, 1988, Robert Fagliano (Mr. Fagliano) purchased 309 leather bound volumes of various issues of three Montana newspapers from a recycling company for $1,750. The Montana newspapers were complete, contained comic strips, and were in good condition. At the time of the purchase, petitioner was an equal partner with Mr. Fagliano in a waste disposal business. Petitioner paid Mr. Fagliano one-half of the cost of the Montana

---

[1]Respondent concedes that petitioners are not liable for the accuracy-related penalties under sec. 6662(a) for the taxable years 1993 and 1994.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue.

newspapers and obtained a 50-percent ownership interest in the newspapers. The Montana newspapers were stored in Mr. Fagliano's garage at his home in Bozeman, Montana. Mr. Fagliano did not take out separate insurance on the Montana newspapers, nor did he increase his homeowner's insurance beyond its then current $125,000 coverage. At the time the Montana newspapers were purchased, neither petitioner nor Mr. Fagliano was a dealer in rare or early newspapers.

In 1990, a decision was made to donate the newspapers to the San Francisco Academy of Comic Art (SFACA). The SFACA was founded by Bill Blackbeard (Mr. Blackbeard) in 1969 as a research center and library devoted to the American comic strip. The SFACA is a qualified section 170(c) organization. Mr. Blackbeard, the director of the SFACA, was not interested in the Montana newspapers and provided the name of Chris Berglas (Mr. Berglas) to facilitate an exchange of newspapers in order to provide the SFACA with newspapers it preferred.

On July 5, 1990, Mr. Berglas, proprietor of The Authentic Journal, a business involved in the retail of newspapers, agreed to evenly exchange certain Los Angeles and Chicago newspapers for the Montana newspapers. The agreement required the Montana newspapers to be shipped to Mr. Berglas, who would then deliver the Los Angeles and Chicago newspapers to the SFACA. On August 9, 1990, the Montana newspapers were shipped from Bozeman,

Montana, to Mr. Berglas in Gardena, California.  The Montana newspapers were not insured when they were shipped to Mr. Berglas.  In January of 1991, Mr. Berglas delivered the Los Angeles and Chicago newspapers to the SFACA.

The following Los Angeles and Chicago newspapers were donated to the SFACA in January of 1991:[3]

1.  Los Angeles Herald, Los Angeles Herald-Express:  A 6-day-a-week newspaper.  A total of 6,260 newspapers representing an unbroken run from 1931 through 1950.

2.  Los Angeles Examiner:  A 7-day-a-week newspaper.  A total of 990 newspapers, including Sunday comics, representing the time period of December 1903, through December 1906, with four volumes missing from 1903 to 1906 (single issue volumes).  Additionally, a total of 13,320 newspapers representing the time period of January 1907 through December 1918, and consisting of an average of three editions per day including four duplicate volumes for the years 1907 through 1918.

3.  Chicago Tribune:  A 7-day-a-week newspaper.  A total of 13,140 newspapers, including Sunday comics, representing the time

---

[3]The parties agree that the Los Angeles and Chicago newspapers were donated to the San Francisco Academy of Comic Art and that petitioners are entitled to a charitable contribution deduction for one-half the value of the Los Angeles and Chicago newspapers.

period of January 1915 (only 7 months for 1915) through June 1951 (single issue volumes). In total, 33,710 newspapers were donated to the SFACA with a combined weight of approximately 2,170 pounds. The newspapers were in firmly bound volumes and were in above-average condition.

In 1998, Ohio State University purchased the entire newspaper collection of the SFACA for $100,000. The Los Angeles and Chicago newspapers donated by petitioner and Mr. Fagliano constituted a small portion of the collection purchased by Ohio State University.

Petitioners' Federal income tax return for 1991 included a Form 8283, Noncash Charitable Contributions, claiming a charitable contribution of $589,925 attributable to one-half of the value of the Los Angeles and Chicago newspapers donated to the SFACA. Attached to petitioners' return was an appraisal, dated January 25, 1991, from Hal Verb (Mr. Verb). In the appraisal, Mr. Verb stated that the estimated saleable value of the newspapers, not including the magazine and Sunday comic sections, was $1,179,850.[4] On the basis of the percentage limitations on charitable deductions, petitioners limited the amount of their charitable deduction for the newspapers for 1991 to $144,448 and carried the excess contribution forward to 1992.

---

[4]Mr. Verb determined that the newspapers had an average value of $35 per issue and multiplied this figure by 33,710, the number of issues donated to the SFACA.

For 1992, petitioners claimed $42,738 as a charitable deduction for the newspapers and carried the excess contribution forward to 1993. For 1993, petitioners claimed a charitable contribution carryover of $402,699, but limited the amount of their charitable deduction to $126,605, and carried the excess contribution forward to 1994. For 1994, petitioners claimed a charitable contribution carryover of $276,094, but limited the amount of their charitable deduction to $50,513, and carried the excess contribution forward to 1995.

On March 24, 1998, respondent issued a notice of deficiency for the years 1993 and 1994. In the notice of deficiency, respondent determined that the fair market value of petitioners' 50-percent share of the Los Angeles and Chicago newspapers donated to the SFACA was not greater than $5,000. Because petitioners claimed charitable contribution deductions exceeding $5,000 in prior years, respondent eliminated the carryovers to 1993 and 1994. Petitioners timely filed a petition to this Court seeking a redetermination. In May of 2000, Mr. Verb issued petitioner an updated appraisal of the newspapers, this time including the value of the magazine, Sunday comic, and daily comic strip sections. In his appraisal, Mr. Verb determined that the magazine, Sunday comic, and daily comic sections were worth $426,947.50.

## OPINION

The issue for decision is the fair market value of the donated Los Angeles and Chicago newspapers for purposes of determining the proper amount of petitioners' charitable contribution deductions. The parties agree that petitioners are entitled to a charitable contribution deduction for one-half the value of the newspapers; however, the parties disagree as to the appropriate market to be used and the fair market value of the newspapers.

Section 170 allows an individual to deduct charitable contributions, subject to certain percentage limitations, with a carryover of any excess contributions. See sec. 170(a), (b), (d). If a charitable contribution is made in property other than money, the amount of the taxpayer's contribution is the fair market value of the property at the time of the contribution. See sec. 1.170A-1(c), Income Tax Regs. Section 1.170A-1(c)(2), Income Tax Regs., defines fair market value as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts." The fair market value of donated property as of a given date is a question of fact to be determined from the entire record. See Goldstein v. Commissioner, 89 T.C. 535, 544 (1987); Skripak v.

Commissioner, 84 T.C. 285, 320 (1985); Zmuda v. Commissioner, 79 T.C. 714, 726 (1982), affd. 731 F.2d 1417 (9th Cir. 1984).

Section 170 and the regulations promulgated thereunder are silent regarding the market to be used in determining the fair market value of donated property. However, it has been recognized that the valuation test for charitable contribution deduction purposes is generally the same as that used for estate and gift tax purposes. See United States v. Parker, 376 F.2d 402, 408 (5th Cir. 1967); Lio v. Commissioner, 85 T.C. 56, 66 (1985), affd. sub nom. Orth v. Commissioner, 813 F.2d 837 (7th Cir. 1987); Anselmo v. Commissioner, 80 T.C. 872, 881 (1983); see also Anselmo v. Commissioner, 757 F.2d 1208, 1214 (11th Cir. 1985) ("In the usual case, however, there should be no distinction between the measure of fair market value for estate and gift tax and charitable contribution purposes."), affg. 80 T.C. 872 (1983). Section 20.2031-1(b), Estate Tax Regs., and section 25.2512-1, Gift Tax Regs., provide that the fair market value of an item of property is to be determined in the market in which such item is "most commonly sold to the public." In the normal situation, a sale "to the public" refers to a sale to the "retail customer who is the ultimate consumer of the property." Anselmo v. Commissioner, 80 T.C. at 882. The "ultimate consumer" is deemed to be a customer who does not hold the item for subsequent resale. Goldman v. Commissioner, 388 F.2d 476, 478

(6th Cir. 1967), affg. 46 T.C. 136 (1966); <u>Lio v. Commisisoner</u>, <u>supra</u> at 70. In this context, the term "retail" does not mean that the most expensive source is the only source for determining fair market value. <u>Lio v. Commissioner</u>, <u>supra</u> at 70. The determination of the appropriate market for valuation purposes is a question of fact. See <u>Anselmo v. Commissioner</u>, 757 F.2d at 1213; <u>Lio v. Commissioner</u>, <u>supra</u> at 66-67; <u>Chou v. Commissioner</u>, T.C. Memo. 1990-90, affd. without published opinion 937 F.2d 611 (9th Cir. 1991).

The parties identify two markets for old newspapers. The first is the retail market.[5] In the retail market, individual newspapers are sold to purchasers interested in obtaining a newspaper from a specific date. Generally, purchasers in the retail market desire a newspaper from their date of birth or from the date they were married, or from a date on which a significant event occurred. The sale of these birthday, anniversary, and significant event newspapers is usually done by newspaper dealers. Newspaper dealers obtain the old newspapers and advertise their availability for sale to individual purchasers. Purchasers order a newspaper from the specific date that they are interested in and the dealer provides the newspaper, usually in

---

[5]For purposes of this case, we use the term "retail" to refer to the market where sales of individual newspaper issues or comic strips are made to different purchasers interested in specific issues or comic strips.

some type of presentation folder.  The sales price of these newspapers varies depending on the condition, content, and date of the newspaper.  The evidence presented by the parties reflects that the average price for an old newspaper in the retail market is between $25 and $40, although issues reporting significant events generally sell for much higher amounts.[6]  Additionally, an individual newspaper may retail for a higher amount depending on the presentation of the newspaper.[7]  Daily and Sunday comic sections are also sold in the retail market to individual consumers interested in specific characters or strips.

The other market for old newspapers is the wholesale market.[8]  Generally, purchasers in the wholesale market consist of newspaper collectors and newspaper dealers interested in purchasing a collection of newspapers.  Collectors generally purchase a newspaper collection for their own personal use, while dealers will purchase a collection in order to sell individual issues in the retail market.  In order for dealers to sell

---

[6]For example, a newspaper dated May 23, 1934, might retail for $95 due to its reporting the death of Bonnie and Clyde, whereas a newspaper from May 26, 1935, might retail for $40 due to its reporting of Babe Ruth hitting his 714th home run.

[7]For example, a newspaper presented in a clear vinyl portfolio would generally retail for much less than the same newspaper presented in a gold-leaf frame.

[8]For purposes of this case, we use the term "wholesale" to refer to a market where collections of newspapers are sold to individuals.

individual issues in the retail market, they must remove the issues from their bindings, prepare them for sale, and locate willing buyers for each date. The purchase price of a newspaper collection in the wholesale market depends on a variety of factors, including the condition, content, and date and title of the newspapers. The value attributable to an individual issue generally diminishes when it is sold as part of a collection.

Both parties relied on the reports and testimony of expert witnesses for purposes of determining the appropriate market and the fair market value of the donated Los Angeles and Chicago newspapers. Valuation is an approximation derived from all the evidence. See Helvering v. Safe Deposit & Trust Co., 316 U.S. 56, 66-67 (1942); Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285; Estate of Davis v. Commissioner, 110 T.C. 530, 537 (1998). The opinions of experts are admissible and relevant to the issue of value, but the opinions must be weighed in light of each expert's qualifications and all other relevant evidence of value. See Johnson v. Commissioner, 85 T.C. 469, 477 (1985). We are not bound by these opinions and may reach a decision based on our own analysis of all the evidence in the record. See Helvering v. National Grocery Co., 304 U.S. 282, 295 (1938); Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990). We may accept the opinion of an expert in its entirety, see Buffalo Tool & Die

Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980), or we may be selective in the use of any portion, see Parker v. Commissioner, 86 T.C. 547, 562 (1986).

Petitioners argue that the fair market value of the Los Angeles and Chicago newspapers in the retail market at the time of the donation was $1,549,796.50 and that petitioners' charitable contribution is $774,898.10.[9]  Petitioners rely on the reports and testimony of their expert, Mr. Verb.  Mr. Verb's qualifications for valuing the newspapers includes:  (1) Flea market experience; (2) operation of a comic book store from 1971 to 1975; (3) attendance and participation in comic conventions since the early 1970's; and (4) sales at collectibles conventions since the early 1970's.  Mr. Verb's experience in selling newspapers is limited to individual sales in the retail market, and he testified that he had no experience in dealing with a collection of newspapers containing over 30,000 issues.

Mr. Verb computed the value of the newspapers by determining the average retail price for one individual issue and then multiplying that price by the total number of newspapers.

---

[9]Mr. Verb determined, and petitioners originally argued, that the overall value of the donated newspapers was $1,606,797.50, and that petitioners' charitable contribution was $803,398.75.  In their reply brief, petitioners concede that they overvalued the newspapers because they did not account for the fact that the Sunday comics were printed on both sides of the newspapers; thus, their value was only one-half of the amount attributed to them by Mr. Verb.

Specifically, Mr. Verb determined that the newspapers had an average estimated saleable value of $35 per issue, based on his own personal experience in handling and selling newspapers and the retail price for individual newspapers listed in an advertisement of the largest distributor of retail newspapers in the United States. Mr. Verb valued the magazine, Sunday comic, and daily comic strip sections separately and added this figure to the value he determined for the newspapers.[10] In valuing the daily and Sunday comic strip sections, Mr. Verb assumed that they would be cut out of the newspapers and sold individually.[11]

Mr. Verb did not reduce his valuation to account for: (1) The number of transactions required to sell each individual issue and comic strip; (2) the costs required to prepare the individual issues and comic strips for sale to purchasers; and (3) the costs which would be incurred in storing the newspapers and locating willing buyers for each date contained in the collection. Mr. Verb did not consider the fact that the Los Angeles and Chicago newspapers had been evenly exchanged for the Montana newspapers which had been purchased for only $1,750 in 1988.

---

[10]Although petitioners argue that the magazine sections have a separate value, Mr. Verb did not assign a value to them.

[11]However, Mr. Verb testified that an individual newspaper would generally not have any value for birthday or anniversary purposes if comics were cut out of it.

Respondent argues that the fair market value of the Los Angeles and Chicago newspapers in the wholesale market at the time of the donation was $14,271.[12] Respondent relies on the report and testimony of Timothy Hughes (Mr. Hughes) to establish the fair market value of the newspapers. Mr. Hughes started in the rare newspaper business in 1976 and currently maintains an inventory of over one million newspapers dating from 1550 through 1993. He publishes six catalogs per year containing listings of historic newspapers for sale, and he also maintains a website listing newspapers for sale. Mr. Hughes has spent more than 23 years working to establish a mailing list of newspaper collectors and as of December 1998, he had 755 active buyers on the mailing list. Mr. Hughes regularly buys and sells newspaper collections and also provides individual issues for sale to retail customers. He is a member of the board of advisers of Warman's Americana & Collectibles price guide, a reference source for American collectibles, and produces the annual price list for early and rare newspapers found in the guide. Mr. Hughes has provided consulting services, including valuations, to (1) the Newseum,[13] (2) Sotheby's and Christie's auction firms in New York City, and (3) leading book and autograph dealers.

---

[12]Thus, the value of petitioners' 50-percent interest in the newspapers at the time of the donation would have been $7,135.50.

[13]The Newseum is a media museum located in the Washington, D.C., metro area, which contains newspaper exhibits.

Mr. Hughes felt that willing buyers of the Los Angeles and Chicago newspapers included newspaper collectors, newspaper dealers, book dealers, magazine dealers, and others who had a serious interest in newspaper collections. Mr. Hughes valued the newspapers according to condition, content, and date and title. Mr. Hughes looked at comparable sales of newspaper collections that he had purchased for his business to aid in determining the fair market value of the newspapers.[14] He used the comparable sales as a guideline to determine an annual price for the newspaper runs based on their time period. Mr. Hughes also relied on prices contained in Warman's Americana & Collectibles price guide, for which he annually produces the price list for early and rare newspapers. In assigning a price to annual runs of newspapers contained in the collection, Mr. Hughes accounted for the fact that newspaper runs from certain years or time

---

[14]Generally, comparable sales of similar properties that are reasonably proximate in time represent the best evidence of fair market value. See Estate of Spruill v. Commissioner, 88 T.C. 1197, 1229 n.24, 1233 (1987); Estate of Rabe v. Commissioner, T.C. Memo. 1975-26, affd. without published opinion 566 F.2d 1183 (9th Cir. 1977). The comparable sales relied upon by Mr. Hughes occurred primarily in the years 1995 to 1997. In some cases, sales that occurred during years other than those in issue are helpful in determining fair market value because those sales may indicate the fair market value for the years in issue. See Estate of Spruill v. Commissioner, supra at 1233; Estate of Gilford v. Commissioner, 88 T.C. 38, 52-55 (1987); Williford v. Commissioner, T.C. Memo. 1992-450. Mr. Hughes justified his use of comparable sales in later years by noting in his appraisal and at trial that the fair market value of the newspapers has changed very little from 1991 until the present.

periods were more valuable based on such ongoing events as World War I and World War II, the notoriety of gangster activities, and the significant sports stars.

Mr. Hughes valued issues containing significant events on a retail basis, as if they were sold individually. Mr. Hughes also placed an additional value on the newspapers for the Sunday comics. Mr. Hughes determined that the issues containing significant events and the Sunday comic sections were worth approximately 25 percent of their retail value when sold as part of a large collection, and he discounted his valuation to reflect this determination.[15]

In valuing the Los Angeles and Chicago newspapers, Mr. Hughes divided the newspapers into the following three groups: (1) the Los Angeles Herald, Los Angeles Herald-Express; (2) Los Angeles Examiner; and (3) Chicago Tribune. Mr. Hughes did not place a value on the daily comic strip sections for any of the newspapers.[16]

---

[15]For example, Mr. Hughes determined that the issues of the Los Angeles Examiner from 1903 to 1906 contained three issues with significant events which would retail for $50, $85, and $255, if sold individually. To account for the issues being part of a large collection, Mr. Hughes multiplied the combined value of $390 by 25 percent. Thus, Mr. Hughes determined a value of $98 for the significant issues when sold as part of a large collection.

[16]Mr. Hughes testified that cutting a daily comic strip out of an issue ruins that issue. As we noted earlier, Mr. Verb also testified that an individual newspaper would generally not have

(continued...)

Mr. Hughes felt the Los Angeles Herald and Los Angeles Herald-Express runs were above average in value based on the facts that they contained news on World War II, gangster activities, and notable sports stars. Specifically, Mr. Hughes determined that annual runs from the 1930's were worth $135, and annual runs from the 1940's and early 1950's were worth $125. Significant events issues from these periods accounted for an additional $202 of the total value that Mr. Hughes determined. He did not determine an additional value for Sunday comics from these newspapers.[17] Overall, Mr. Hughes determined that the issues from this 20-year period were worth $2,792.

Mr. Hughes felt that annual runs from the Los Angeles Examiner for the years 1903 to 1906 were worth only $30 due to the relative lack of historic events of interest to collectors and lack of persons still alive who were born in those years, and further reduced his valuation based on the fact that these runs were only 68 percent complete. Mr. Hughes placed additional

---

[16](...continued)
any value for birthday or anniversary purposes if comics were cut out of it.

[17]Mr. Verb also did not determine a value for Sunday comics from these newspapers. In the first stipulation of facts, the parties specifically identified which newspaper runs contained Sunday comics. The description of the Los Angeles Herald and Los Angeles Herald-Express does not contain a reference to Sunday comics. On the basis of the failure of both parties' experts to assign any value and the absence of any reference in the first stipulation of facts, we assume that the collection did not contain Sunday comics for this group of newspapers.

values of $568 and $98, respectively, to account for Sunday comics and significant events issues.  With respect to the issues from 1907 to 1916, Mr. Hughes determined a value of $50 per annual run.  He increased the value to $100 per annual run for the years 1917 and 1918 due to news coverage of World War I.  An additional value of $690 was added to account for the significant events issues.  Mr. Hughes did not determine an additional value for Sunday comics from newspapers for the years 1907 through 1918.[18]  Overall, Mr. Hughes valued the Los Angeles Examiner newspapers at $3,613.

Finally, Mr. Hughes determined a value for the Chicago Tribune newspapers.  In valuing these annual runs from 1915 through 1951, he accounted for the facts that the newspapers contained war coverage, the "gangster era" in Chicago, and that there was more interest in individual issues for birthday and anniversary purposes because Chicago was the largest city in the Midwest.  Mr. Hughes valued annual runs of the Chicago Tribune at between $75 and $175.  Mr. Hughes placed additional values of $2,215 and $378, respectively, to account for Sunday comics and significant events issues.  Overall, Mr. Hughes valued the Chicago Tribune newspapers at $7,866.  Adding the three groups

---

[18]Conversely, Mr. Verb determined a value for Sunday comic sections for the Los Angeles Examiner issues from 1907 through 1918.  However, the description of the Los Angeles Examiner in the first stipulation of facts does not contain a reference to Sunday comics for the years 1907 to 1918.

together, Mr. Hughes determined that the Los Angeles and Chicago newspaper collection had a fair market value of $14,271 as of the contribution date.

In his appraisal, Mr. Hughes distinguished between valuing newspapers individually and valuing collections of newspapers. He explained that while a person might pay $35 for an issue from his date of birth, or a collector curious about the news on a particular date might pay $5 for the same issue, the value of that issue diminishes significantly when it is purchased as part of a large collection of newspapers and might be worth only $.30. At trial, Mr. Hughes noted that the retail market for the early 1900's newspapers would be limited, based on the fact that there were fewer people alive in 1991 who were born or married in that time period.[19]  Overall, Mr. Hughes testified that he went with an "absolute optimum" for value and determined a maximum fair market value for the entire collection.

The first issue we must decide is the appropriate market to use for purposes of determining the fair market value of the Los Angeles and Chicago newspapers.  Respondent contends that the appropriate market is the wholesale market because the newspapers would most commonly be sold to newspaper collectors, or to newspaper dealers who would subsequently prepare the individual

---

[19]Mr. Hughes also testified that he had never been asked by a potential purchaser for a newspaper from the date of birth of an ancestor.

issues for sale in the retail market.  Petitioners claim that the appropriate market is the retail market because the newspapers and comic sections could have been sold to individuals interested in obtaining specific issues or comic strips.  Petitioners also claim petitioner and Mr. Fagliano were not the ultimate consumers of the newspapers because they did not purchase the newspapers and comic strips for their own use or subsequent donation.  Petitioners contend that the newspapers were purchased with an intent to sell individual issues to consumers interested in purchasing birthday and anniversary issues, or specific comic strips.

In Anselmo v. Commissioner, 80 T.C. at 872, we were required to value a donation of 461 low quality gemstones.  Jewelry stores would generally not sell the gemstones to individual purchasers but would incorporate the gemstones into separate pieces of jewelry.  See id. at 877-878.  We rejected the taxpayers' contention that the stones should be valued individually, based on the price that each individual gemstone would sell for in retail jewelry stores.  See id. at 881.  We found that such stones were not commonly sold to individual purchasers but rather that the appropriate market for sale was to retail jewelers for use in the manufacture of jewelry.  See id. at 882.  We reasoned that no one farther down the distribution chain would purchase the gems in their unmodified state and that the gemstones were

consumed in the process of manufacturing items of jewelry.  See id. at 883.

In Akers v. Commissioner, 799 F.2d 243 (6th Cir. 1986), affg. T.C. Memo. 1984-490, the court relied on our reasoning in Anselmo v. Commissioner, 80 T.C. 872 (1983), in holding that a tract of land containing approximately 1,261 acres should be valued based on comparable sales of other tracts of land containing over 1,000 acres.  See Akers v. Commissioner, supra at 244-246.  The court rejected the taxpayers' contention that the value of the property should be determined based on the value of the property as if it was subdivided into 24 lots averaging 52.5 acres each.  See id. at 245.  The court reasoned that the "ultimate consumer" of a 50-acre lot would normally not have the time, inclination, expertise, or capital to buy the entire property with a view to subdivision and sale of the excess.  Id. at 246.  The court distinguished its situation from one where property consists of multiple items available for sale, by explaining that the property in the case at hand was not subdivided and ready for immediate sale in the retail market. See id. at 247.  We find the reasoning in Anselmo v. Commissioner, supra, and Akers v. Commissioner, supra, applicable to the instant case.

The Los Angeles and Chicago newspaper collection contained 33,710 issues, all in firmly bound volumes.[20] We believe that bound volumes of newspapers containing thousands of issues would generally not be sold to individual purchasers interested in a specific issue or comic strip; they would most commonly be sold to newspaper collectors, newspaper dealers, and others interested in obtaining a newspaper collection.[21] If petitioner and Mr. Fagliano intended to sell individual issues, this would not be a "subsequent resale" of the newspapers because the items being sold would be individual issues and comic strips, not the bound volumes of newspapers. The individual issues contained in the Los Angeles and Chicago newspapers could not readily be sold to purchasers interested in birthday, anniversary, and significant event newspapers because the individual issues were not ready for immediate sale. See Akers v. Commissioner, supra at 247. The

---

[20]Neither party established the number of bound volumes contained in the collection or which specific individual issues were contained in each volume. At trial, Mr. Verb provided a rough estimate of approximately 50 issues in each bound volume; however, he also testified that one bound volume contains 3 months of issues. In his appraisal, respondent's expert, Timothy Hughes (Mr. Hughes), stated that bound volumes of newspapers from the post 1940's might contain as few as 15 days of newspapers, while bound volumes of newspapers from the 18th century contain as many as one year of newspapers. In the first stipulation of facts, some of the Los Angeles and Chicago newspapers were identified as being single issue volumes, however, neither party addressed this point.

[21]We note that petitioners do not dispute that neither petitioner nor Mr. Fagliano was a dealer in rare or early newspapers at the time the Montana newspapers were purchased.

individual issues would have to be removed from their bindings, made available for presentation, and willing purchasers would have to be located for each date in order for the entire collection to be sold.  An "ultimate consumer" would generally not purchase an entire collection of 33,710 newspapers in bound volumes, or even one bound volume, for the purpose of obtaining one specific issue or comic strip.  We conclude that the ultimate consumers of the bound newspapers in issue are newspaper collectors, newspaper dealers, and others interested in obtaining a newspaper collection.  Accordingly, we hold that the appropriate market for purposes of determining the fair market value of the Los Angeles and Chicago newspapers is the wholesale market.

After identifying the appropriate market, fair market value is determined by the amount that consumers would pay, in this market, for the items in question on the date of contribution. See Goldstein v. Commissioner, 89 T.C. at 544.  Relevant considerations include the amount that the taxpayer paid for the

property[22] and how the property is used by the donee.[23]  See <u>Lio</u>

<u>v. Commissioner</u>, 85 T.C. at 71; <u>Chiu v. Commissioner</u>, 84 T.C.

722, 734-736 (1985); <u>Skripak v. Commissioner</u>, 84 T.C. at 322.

It is unrealistic to assume that multiplying an average

price of $35 by the 33,710 issues contained in the bound volumes,

and then placing an additional value on the Sunday comic and

daily comic strip sections contained therein, accurately measures

the fair market value of the Los Angeles and Chicago newspapers.

Even Mr. Verb admitted that he would not purchase the Los Angeles

and Chicago newspapers based on a price of $35 per issue.  It

would involve an enormous amount of time, expense, and effort to

sell each of the 33,710 issues.  At trial, respondent's expert

testified that it would take over 100 years to sell each issue

individually.  Mr. Verb could not estimate the amount of time it

would take to sell each issue individually.  Additionally, the

33,710 issues were in firmly bound volumes.  The binding would

---

[22]The Los Angeles and Chicago newspapers were evenly exchanged for the Montana newspapers, which were purchased in 1988 for $1,750.  We note that the Montana newspapers were not insured during storage or during delivery to Mr. Berglas, despite the fact that they were evenly exchanged for the Los Angeles and Chicago newspapers which petitioners claim were worth approximately $1.5 million.

[23]In 1998, the SFACA sold its entire collection of newspapers, of which the Los Angeles and Chicago newspapers constituted a small portion thereof, to Ohio State University for $100,000.  Petitioners do not dispute Mr. Hughes' estimate that the SFACA collection weighed over 75 tons and consisted of approximately 6,666 bound volumes containing approximately 200,000 newspapers.

have to be destroyed, and all the issues would have to be removed in order to prepare individual issues for sale. Mr. Verb testified that when he owned his store, he had to employ a person part-time just to cut comic strips out of newspapers. Finally, the evidence in the record reflects that individual issues sold to retail customers are usually packaged in some form of presentation folder.

The value petitioners attribute to the newspapers fails to account for relevant time and expense factors involved in selling the newspapers in the retail market. Petitioners rely on Mr. Verb's valuation which was simply based on determining the average retail price for an individual newspaper and multiplying this price by the number of issues contained in the collection, without consideration of other factors which would affect the value of the newspapers. Neither petitioners nor Mr. Verb expressed an opinion as to what the value of the newspapers and comic sections would be if they were not sold to individual purchasers interested in specific issues or comic strips.

Respondent relied on the valuation determination of Mr. Hughes. Mr. Hughes' appraisal was thorough, detailed, provided explanations, and was supported by accompanying exhibits. His testimony was consistent with the analysis in his appraisal, and he demonstrated considerable knowledge in the area of early and rare newspapers. Mr. Hughes is a well-known newspaper collector

with extensive experience dealing in collections similar to the Los Angeles and Chicago newspaper collections.  Additionally, he has experience in the retail sale of birthday and anniversary newspapers.

For the years before those in issue, petitioners claimed the following charitable contribution deductions for the Los Angeles and Chicago newspapers:

| Year | Amount |
|------|--------|
| 1991 | $144,448 |
| 1992 | 42,738 |
| Total | 187,186 |

Therefore, unless the fair market value of the newspapers as of January of 1991, was greater than $187,186, petitioners are not entitled to charitable contribution deductions for 1993 or 1994. After reviewing the reports and testimony of the experts, and based on all the evidence in the record, we believe that Mr. Hughes' appraisal considered the relevant factors for purposes of valuing the newspaper collection, and his valuation determination reflects the approximate value of the collection.[24]  Accordingly, we hold that petitioners are not entitled to charitable

---

[24]We note that, in this situation, it is sufficient that we find, as we have, that the fair market value of the newspapers as of January of 1991 was not in excess of the amount of charitable contribution deductions that petitioners took for the newspapers in previous years.  See, e.g., Hamm v. Commissioner, 325 F.2d 934, 939-940 (8th Cir. 1963), affg. T.C. Memo. 1961-347; Rimmer v. Commissioner, T.C. Memo. 1995-215.

contribution deductions for 1993 or 1994 for the donation of the Los Angeles and Chicago newspapers made in 1991 to the SFACA.

<u>Decision will be entered</u>

<u>for respondent as to the</u>

<u>deficiencies</u>.